THOMAS E. MOSS, IDAHO BAR NO. 1058
UNITED STATES ATTORNEY
**DEBORAH A. FERGUSON, IDAHO BAR NO. 5333**
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA IV
800 PARK BOULEVARD, SUITE 600
BOISE, IDAHO 83712
TELEPHONE: (208) 334-1211
FACSIMILE: (208) 334-1414

Attorney for Defendants

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO WOOL GROWERS ASSOCIATION, and DR. MARIE S. BULGIN, <br><br> Plaintiffs, <br><br> vs. <br><br> ED SCHAFER, in his official capacity as the Secretary of the United States Department of Agriculture, GAIL KIMBELL, in her official capacity as the Chief of the United States Forest Service, SUZANNE C. RAINVILLE, in her official capacity as the Forest Supervisor of the Payette National Forest, and UNITED STATES FOREST SERVICE, <br><br> Defendants. | Civil No. 08-00394-S-BLW <br><br> **U.S. FOREST SERVICE'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

I. **INTRODUCTION**

Plaintiffs have filed a complaint challenging two Forest Service reports concerning the risk of disease transmission from domestic sheep to bighorn sheep. The complaint alleges that the Forest Service violated the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2 §§ 1-16 by establishing or utilizing advisory committees to compile the reports without following the procedures required by law. Plaintiffs assert that the Forest Service reports must be set aside under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).

**U.S. FOREST SERVICE'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - Page 1**

## II. FACTUAL BACKGROUND

On July 25, 2003, the Regional Forester for the Intermountain Region of the Forest Service issued a decision revising the Land and Resource Management Plan for the Payette National Forest. This decision was appealed. PP000001. The Chief of the Forest Service issued a decision on the appeals of the revised Forest Plan on March 9, 2005. That decision found the analysis of potential effects to bighorn sheep from domestic sheep grazing inadequate, and concluded that the viability of bighorn sheep populations within the Hells Canyon area appear to be threatened by continued grazing of domestic sheep in or near occupied bighorn sheep habitat. PP000664. Further, the decision found that the entire Hell's Canyon and Payette National Forest bighorn sheep populations were at risk of extirpation if domestic sheep were not removed. PP000664.

In response to that decision, the Payette National Forest initiated an analysis to address the deficiencies identified. As part of this effort, the Forest Service formed a team of federal employees and employees of state game and fish agencies ("expert panel"). They drafted the "Risk Analysis of Disease Transmission Between Domestic Sheep and Bighorn Sheep on the Payette National Forest" ("Risk Analysis") completed on February 6, 2006. AR001123.

The Risk Analysis was then circulated for public comment. Many of the comments received were critical. AR003937; AR012755-56. In response, the Forest Service commissioned a review of the Risk Analysis by a panel of independent scientists ("Science Panel"), who reported various findings. AR003933-84. The Forest Service initiated the process for completing an Environmental Impact Statement on April 11, 2007. AR006388-93. On March 30, 2007, the Western Watersheds Project ("WWP") filed suit in the District of Idaho to enjoin domestic sheep grazing on six allotments on the Payette and Nez Perce National Forests pending completion of that analysis to cure the deficiencies in the revised Forest Plan. The matter is pending before this Court, Case No. 07-151. WWP moved for preliminary injunction in that litigation. The Forest Service implemented several management practices designed to prevent

contact between domestic sheep and bighorns during the 2007 grazing season, including not allowing use of a portion of the Smith Mountain allotment. Accordingly, the Court denied the preliminary injunction on May 11, 2007.

The Forest Service issued Annual Operating Instructions ("AOIs") and permit modifications to Frank Shirts and Shirts Bros. Sheep, alleged members of Plaintiffs' organization, for the 2007 grazing season. The AOIs precluded use of the Curran Hill allotment and a portion of the Smith Mountain allotment that is within and immediately adjacent to the HCNRA, and imposed other requirements to prevent contact and disease transmission between domestic and bighorn sheep. AR008048-54; AR008245-46; AR008033-39; and AR0082324. Plaintiffs filed administrative appeals of the Forest Service decisions and requested a stay. AR014318-56; AR015370. The request for stay was denied. AR016148-59; AR016160; AR015357-68; and AR015369. Plaintiffs operated in accordance with the Forest Service decision during the 2007 grazing season.

Following the 2007 grazing season, in January of 2008, the Forest Service issued decisions adopting permit modifications and AOIs to Frank Shirts and Shirts Bros. for the 2008 grazing season. AR008080-86; AR008242-43; AR008073-79; and AR008236-37. These decisions also limited use of the Smith Mountain and Curran Hill allotments, and prevented use of the Salmon River Driveway for the 2008 grazing season in order to insure separation between domestic sheep and bighorn sheep to prevent disease transmission and morality of bighorn sheep.

Frank Shirts and Shirts Bros. appealed those decisions, AR016161, and the Forest Service denied the appeals in May of 2008. AR020540-51; AR020552; and AR020553-60. The Forest Service also dismissed the appeals of the 2007 decisions since they only affected the 2007 grazing season, which was over. However, the issues raised in the 2007 appeals were fully addressed in the response to the 2008 appeals.

Frank Shirts and Shirts Bros. then filed suit to challenge the Forest Service decisions regarding administration of their permits. This action, Case No. 07-241, (hereinafter "the Shirts'

litigation"), was consolidated with Case No. 07-151. In July of 2008, Frank Shirts and Shirts Bros. filed an amended complaint challenging the most recent Forest Service actions effected their permits, alleging among other things that the Forest Service relied upon the Risk Analysis and Science Panel Report in violation of the FACA. The Court denied the Shirts' summary judgment claim. *See* Case No. 07-151, Dkt. No. 123.

### B.     The Expert Panel's Risk Analysis

The Expert Panel was convened to provide Forest Service decision makers with information about the likelihood of disease transmission from domestic sheep to bighorn sheep on the Payette National Forest. AR001091. The Expert Panel was comprised of six wildlife biologists employed by the Forest Service and State wildlife management agencies. AR001123.

The Expert Panel relied on a considerable body of existing scientific literature concerning the risk of disease transmission from domestic sheep to bighorn sheep generally. AR001102-06. The Risk Analysis is replete with references to this existing research data throughout the document. The result of the Risk Analysis was a map of the Payette National Forest depicting various levels of risk for contact between domestic sheep and bighorn sheep that could result in disease transmission and mortality to bighorn sheep. AR001122.

### C.     The Science Panel Review

The Risk Analysis was circulated for public comment. AR001422. Many of those comments were critical of the Risk Analysis. Consideration of additional scientific publications was suggested and utilization of a broader ranger of technical expertise. AR006533-87. In response, the Forest Service convened the Science Panel to review and comment on the Risk Analysis. AR012755-56. The public comments on the Risk Analysis were summarized for the Science Panel by the Forest Service, and material was provided by the Forest Service and panel members for the Science Panel to review. AR003933-84, AR012065-68, AR012062-64. The Science Panel convened on November 2, 2006 to discuss the materials provided by the Forest Service. The Science Panel was comprised of employees from state and provincial government

wildlife and agriculture agencies, state university researchers in veterinary medicine, and federal employees were either in attendance or on the panel. AR003946. In response to comments on the Risk Analysis, the Forest Service attempted to assemble a broad array of perspectives and disciplines to represent various viewpoints. AR012061, AR011977-80, AR011981, AR006590-91, AR008520-21, AR006592-93, AR013041, AR011982-83, AR013047, AR013050, AR013045, AR013048, AR013042, AR006588-89, AR013050, AR013044, AR008528-31, AR008524-27, AR006595-96, AR013043, AR013040, AR013046, AR013049, AR013587. Where prospective panelists who were that were not available to participate were invited to suggest replacements to represent their perspective. AR013043.

The review conducted by the Science Panel was documented in an Executive Summary, which summary sets out six points, sometimes referred to as the "Payette Principles." AR003933. The summary acknowledges many uncertainties about the range of bighorn and the causal agents that lead to bighorn sheep die offs. However, the Executive Summary notes a general consensus that contact between domestic sheep and bighorn sheep increases risk of mortality to bighorn sheep due largely to respiratory diseases. *Id.*

### D. Other Information Relied Upon by the Forest Service

In addition to the Risk Analysis and Science Panel Summary, the Forest Service and the Panels relied upon a large body of scientific research and literature concerning disease transmission between domestic sheep and bighorn sheep. AR001102-06; AR003955-54. The Chief's Forest Plan appeal decision also cites additional studies on this subject. PP000667. This information existed prior to and was generated independently of the work produced by the Expert Panel and Science Panel.

## III. SUMMARY OF ARGUMENT

This litigation is the same FACA litigation brought by the Shirts in Case No. CV 07-241 already decided by this Court. It raises the same issues, and represents the same parties.

Accordingly, this action must be dismissed in accordance with principles of res judicata and collateral estoppel.

Even if the suit were not dismissed, Plaintiffs' claim must fail on the merits for the same reasons the Court did so in the Shirts' litigation. Plaintiffs are not entitled to summary judgment because the Forest Service did not violate the FACA. The Expert Panel that worked with the Forest Service in producing the Risk Analysis, and the Science Panel that assisted in reviewing the Risk Analysis, are exempt from FACA under 2 U.S.C. § 1534(b). Both groups were involved in intergovernmental communications between federal officials and employees of state government to exchange information relating to federal programs concerning the management of livestock and wildlife. where the states share responsibility. Therefore, there was no requirement for the Forest Service to follow the procedures set forth under FACA for establishing, utilizing, or operating an advisory committee.

However, even if FACA applied to these groups, Plaintiffs would not be entitled to the relief they are seeking. Plaintiffs assert that utilizing an advisory committee in violation of FACA requires that the agency action be set aside. Plaintiffs cite no authority for the proposition that they are entitled to such extraordinary relief. At most, courts have enjoined ongoing meetings or the production of final reports by advisory committees formed in violation of FACA. More often, the courts have found no entitlement to injunctive relief whatsoever. In this case, where the Forest Service decisions that are being challenged relied on extensive, documented scientific information in addition to the Risk Assessment and the Science Panel review principles, there is no basis for the awarding the relief sought by Plaintiffs. Awarding such relief would not further the purposes of FACA.

## IV. ARGUMENT

The FACA contains no independent provision for enforcement. Claims for violation of FACA must be brought under the Administrative Procedure Act ("APA") 5 U.S.C. §§ 704, 706. *Wyo. Sawmills, Inc. v. U.S. Forest Service*, 179 F. Supp.2d 1279, 1298-1299 (D. Wyo. 2001);

*Idaho Farm Bureau Fed'n v. Babbitt*, 900 F. Supp. 1349, 1363-64 (D. Idaho 1995) (applying APA standard for determination of standing to bring suit for violation of FACA.). A plaintiff bringing suit for a violation of FACA must demonstrate that it meets the APA's jurisdictional requirements, including the requirement to show that it is challenging a final agency action, and that it has standing to sue. *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs,* 543 F.3d 586, 591 (9th Cir. 2008); *Summers v. Earth Island Inst., 129 S. Ct. 1142* (S. Ct. March 3, 2009).

### A.     Final Agency Action

Two conditions must be satisfied for an agency action to be final. "First, the action must mark the consummation of the agency's decisionmaking process-it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences flow." *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997). The issuance of two research reports by the Forest Service do not meet these requirements, and may be challenged under the APA.

Under the first prong of this test, it must be shown that no further agency decisionmaking can be expected. That is not the case here. The preparation of these reports by the Forest Service is just a first step in the process of determining whether and how to amend the Forest Plan. The Forest Service has issued a draft environmental impact statement for public comment, and will be issuing a final environmental impact statement before making any final decisions. Thus, the issuance of these reports by the Forest Service does not meet the first prong of the test.

Second, it must be shown that an action determines rights or obligations, or from which legal consequences flow. *Id.* Under the reasoning in *Fairbanks,*, the issuance of research studies or reports would not meet this test either. *Fairbanks,* 543 F.3d at 593-94. As in *Fairbanks,* the Forest Service reports do not, in themselves, effects Plaintiffs' rights or obligations, or impose any legal consequences on Plaintiffs.

The sole action identified in Plaintiffs' Complaint which might meet this test is described in paragraph 75, alleging that the Forest Service relied on the reports to take action to modify the

grazing permits of alleged members of Plaintiffs' organization, Carlson Livestock Company, Frank Shirts, Jr. and Shirts Bros. Sheep. However, this is precisely the claim that is currently pending in the Shirts' litigation. Plaintiffs' in both cases have alleged in motions for summary judgment that the Forest Service violated FACA in preparing the same reports, and therefore unlawfully took action to modify their permits. *See* attached Ex. A (Am. Comp., Case No. 07-151, Dkt. No. 4) and Ex. B (Mem. in Supp. of Summ. J. Mot., Case No. 07-151).

On November 26, 2008, this Court denied a Motion for Summary Judgement (Case No. 07-151, Dkt. No. 123) in the Shirts' litigation, raising precisely the same claims. That decision addresses the only parties upon which Plaintiffs in this case may rely to acquire standing. Having identified no other party with a ripe cause of action to make the claims set forth in the complaint, Plaintiff's action must be dismissed.

### B.    Standing

"It is common ground that . . . organizations can assert the standing of their members." *Summers*, *129 S. Ct.* at 1149. To establish standing, an organization must point to the concrete and particularized injury to its members that it seeks to protect. *Id.* Plaintiffs in this case, identify the permit actions taken by the Forest Service in reliance on the challenged reports that affected Frank Shirts, Shirts Bros. Sheep, and Carlson. Compl. ¶ 75. Plaintiffs' sole basis for standing is the injury to these members, who are pursuing the identical lawsuit in the Shirts' litigation.

Plaintiffs have identified no other use of the challenged reports that threatens imminent and concrete harm to other members. As in *Summers*, any risk that these reports will be used to the detriment of other members is entirely speculative, and therefore insufficient to confer standing on Plaintiffs. ". . . [D]eprivation of a procedural right without some concrete interest that is affected by the deprivation - a procedural right *in vacuo* - is insufficient to create Article III standing. Only a 'person who has been accorded a procedural right to protect *his concrete interests* can assert that right without meeting all the normal standards for redressability and

immediacy.'" *Summers, 129 S. Ct. At 1151* (*citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572 n.7 (1992). The mere possibility that some members may be affected by the agency action challenged is not sufficient to confer organizational standing. *Id.* Nor does Plaintiff Dr. Bulgin, President of Idaho Wool Growers Association, meet the requirements for ripeness or standing. The Compliant identifies no final agency action that has affected her, and identifies no concrete injury that would meet Article III requirements for standing.

The Ninth Circuit has considered the extent to which the actions of an organization and its members should be considered in applying this doctrine. *Apache Survival Coalition v. United States*, 21 F.3d 895 (9th Cir. 1994) (*citing Cf.18 Charles A Wright & Arthur R. Miller, Federal Practice and Procedure* § 4456 at 491 (1981)). The Court concluded that an organization is bound by the action of its members in applying the doctrine of laches. "I[t] seems clear enough that [an] association should not be able to evade preclusion continually by averring that unidentified members are not bound and bringing successive suits by claiming injury to different identified members." *Id.* The elements necessary to hold a representative party to be in privity with its members are "[A] close relationship, substantial participation, and tactical maneuvering all support a finding of virtual representation; identity of interests and adequate representation are necessary to such a finding." *Irwin v. Mascott,* 370 F.3d 924, 930 (9th Cir. 2004). Here, the only members of Plaintiffs' organization with standing to sue and a ripe cause of action are pursuing this same claim in the Shirts' litigation. The interests of those members are being adequately represented there.

## C. Res Judicata And Collateral Estoppel

An action is barred by the doctrine of res judicata where "'the earlier suit . . . (1) involved the same 'claim' or cause of action as the later suit, (2) reached a final judgement on the merits, and (3) involved identical parties or privies." *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985 987 (9th Cir. 2005) (citing Sidhu v. Flecto Co., 279 F.3d 896, 900 (9th Cir. 2002). "Three factors must be considered before applying collateral estoppel: '(1) the issue at stake must be

identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated [by the party against whom preclusion is asserted] in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action.'" *McQuillion v. Schwarzenegger*, 369 F.3d 1091, 1096 (9th Cir. 2004) (*quoting Town of N. Bonneville v. Callaway*, 10 F.3d 1505, 1508 (9th Cir. 1993)).

The Court has ruled on precisely the same issues in the Shirts' litigation, brought by the same parties upon whom Plaintiffs in this case rely for standing. Plaintiffs should not be permitted to re-litigation the same claims.

### D.     FACA Does Not Apply To The Panels

An exception to the requirements of FACA is provided in 2 U.S.C. § 1534(b):

> The Federal Advisory Committee Act (5 U.S.C. App.) shall not apply to actions in support of intergovernmental communications where-
>> (1) meetings are held exclusively between Federal officials and elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) acting in their official capacities; and
>> (2) such meetings are solely for the purposes of exchanging views, information, or advice relating to the management or implementation of Federal programs established pursuant to public law that explicitly or inherently share intergovernmental responsibilities or administration.

*See, e.g., Wyo. Sawmills Inc.,* 179 F. Supp. 2d 1279 (D. Wyo. 2001). FACA also does not apply to groups described in 41 CFR § 102-3.40 because they do not meet the definition of an "advisory committee" in 5 U.S.C. App. 2 § 3(2), or because other statutory exemptions apply. Ex. C, Mem. for the Heads of Dep'ts and Agencies, Guidelines for Implementing Section 204, "State, Local, and Tribal Government Input," of Title II of P.L. 104-4, M-95-20 (OMB September 21, 1995).

#### 1.     The Expert Panel's Preparation of the Risk Analysis

The group that prepared the Risk Analysis was comprised of Forest Service employees and employees of the Idaho Department of Fish and Game and Oregon Department of Fish and

Wildlife. AR001123. This group is an intergovernmental committee that is exempt from FACA under 40 CFR § 102-3.40(g) and 2 U.S.C. § 1534(b).

The purpose of the group was to evaluate potential for disease transmission between domestic sheep and bighorn sheep on the Payette National Forest. AR001079-1123. Under 16 U.S.C. § 528, national forests are established by Congress to be administered by the Forest Service for purposes which include range, fish, and wildlife. 16 U.S.C. §§ 475, 551. The management of rangeland activities, such as domestic sheep grazing, and the effects of those activities on wildlife, such as bighorn sheep, relate to the "implementation of Federal programs established pursuant to public law." 2 U.S.C. § 1534(b)(2).

The Idaho Department of Fish and Game ("IDFG") is an executive department of the state of Idaho, created by the legislature in accordance with Article IV section 20 of the State Constitution. I.C. 36-101. The IDFG is supervised by the Idaho Fish and Game Commission, which is appointed by the Governor. I.C. 36-102. The powers and duties of the Commission are set forth in I.C. 36-104, and include investigating the status of the state's wildlife populations, and managing the state's wildlife populations. The IDFG has authority to act on behalf of elected state officials, and shares intergovernmental responsibilities with the Forest Service for the protection and management of wildlife.

Similarly, the Oregon Department of Fish and Wildlife ("ODFW") is established by the Oregon State legislature as part of the executive branch under the State Fish and Wildlife Commission. ORS § 496.080. The Commission is appointed by the Governor. ORS § 496.090. The Commission is charged by the state legislature to manage wildlife resources, and regulate uses of such resources. ORS § 496.118. Accordingly, the ODFW shares intergovernmental responsibility with the Forest Service for the management of wildlife, including bighorn sheep.

The Expert Panel that prepared the Risk Analysis meets the exemption from FACA provided by 2 U.S.C. § 1534(b). Therefore, there could be no violation of FACA by the Forest Service in establishing or utilizing the Expert Panel. This exemption to FACA has been

**U.S. FOREST SERVICE'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - Page 11**

characterized as "sweeping in scope." *Wyo. Sawmills, Inc.*, 179 F. Supp. 2d 1279, 1305 (D. Wyo. 2001). Thus, the exemption applies to the entire range of intergovernmental responsibilities or administration. *Id.*

### 2.    The Science Panel

The Science Panel was comprised of Forest Service employees and employees from Montana Fish Wildlife, and Parks, Idaho Department of Agriculture, IDFG, Washington State University, the British Columbia Ministry of Agriculture, California Department of Fish and Game, the U.S. Geological Survey, Colorado Division of Wildlife, and University of Idaho. Again, the employees of state and provincial government wildlife and agriculture agencies represent elected officials of those government entities concerning shared responsibilities of the Forest Service for the management of wildlife and agricultural programs, like management and protection of bighorn sheep and domestic sheep grazing.[1]

While some cases have held that committees utilizing university employees are not subject to other FACA exemptions, one of those cases predates enactment of this exception to FACA, 2 U.S.C. § 1534, and no cases were found specifically addressing the question of whether the exemption applies to employees of state universities. *See, Nw. Forest Res. Council v. Espy*, 846 F. Supp. 1009, 1994 (D.D.C. 1994); *Heartwood, Inc. v. U.S. Forest Service*, 431 F. Supp. 2d 28 (D.D.C. 2006). Rather than a per se rule, the determination should turn on the criteria in the statute and regulations, and the function of the university employees. Since the university employees involved here are state employees, and the subject of the Science Panel involves

---

[1]While 2 U.S.C. § 1534(b) does not make specific reference to Canadian provincial governments, they are analogous to the State, local, and tribal governments that are listed in the statute, and including these governmental entities is consistent with the objectives of the exemption to FACA. The courts have rejected literal interpretations of FACA that would result in broad application of its prohibitions because doing so would unduly restrict the ability of the Executive to obtain information. *Wyo. Sawmills, Inc.,* 179 F. Supp. 2d 1279, 1304 (D. Wyo. 2001) (*citing Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 453 (1989)).

intergovernmental responsibilities for wildlife and agriculture, the question is whether these employees were acting on behalf of elected officials.

The University of Idaho is a "land grant college," chartered under I.C. 33-2901 to qualify for federal assistance under 7 U.S.C. §§ 301-305, 307, 308, 321-326, 328 and 341 et seq. The University of Idaho provides courses of study in agriculture and natural sciences, directly related to the domestic sheep and bighorn sheep disease transmission issues that are of mutual intergovernmental interest to the states and the Forest Service. I.C. 33-2813, 2814. In addition, the University of Idaho provides agriculture extension services in cooperation with the U.S. Department of Agriculture as contemplated under 7 U.S.C. §§ 341-349. The University of Idaho was confirmed by the Idaho Constitution in Article IX § 10, as is recognized in sections 10 and 11 of the federal statehood act. P.L. 105-296, 26 Stat. 215.

One of the important functions of the University of Idaho is to conduct research that will enhance the economy of Idaho through the partnership between academia and government. *Idaho State Bd. of Educ. Governing Policies and Procedures,* § III(W)(2)(a). Research conducted by the University of Idaho is utilized by government officials in the state in making policy decisions. The state employees at the University of Idaho have authority to act on behalf of elected officials of the state in the conduct of research and dissemination of scientific information. Accordingly, utilization of these employees by federal agencies is exempt from FACA under 2 U.S.C. § 1534(b).

The courts have rejected rigid interpretations of FACA that would result in broad application of its prohibitions because doing so would unduly restrict the ability of the Executive to obtain information. *Wyo. Sawmills, Inc.,* 179 F. Supp. 2d 1279, 1304 (D. Wyo. 2001) (*citing Public Citizen v. U.S. Dep't of Justice,* 491 U.S. 440, 453 (1989). Because of the important role of state universities, particularly the agricultural land grant universities, in acting as the voice of the state and on behalf of elected officials to conduct and disseminate scientific research, it is appropriate to apply this exemption to FACA.

**U.S. FOREST SERVICE'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - Page 13**

Washington State University has a similar background and purpose as a state land grant college. RCW §§ 28B.30.010, 015, 065, 250, 43.79.120. WSU researchers are state employees, and perform similar functions to conduct and disseminate research and scientific data on behalf of elected state officials.

### E. Even If FACA Was Violated, Plaintiffs Are Not Entitled To The Relief Sought

FACA contains no provision for judicial review or remedies for violation. Presumably, Plaintiffs assert that the Forest Service grazing decisions are arbitrary, capricious, or otherwise not in accordance with law because the Forest Service relied on information contained in the Risk Analysis and Science Panel review, and contend the decision should be set aside or enjoined under the APA. However, the courts have not generally afforded this sort of relief for violation of FACA. In the few instances where any relief at all has been granted, it has not been directed at the agency action that relied on information improperly obtained, but at the use of the information generated in violation of FACA.

#### 1. Plaintiffs are not Entitled to the Extraordinary Relief They Seek

Plaintiffs assert that a FACA violation would require the Forest Service's grazing permit decisions be set aside, citing *Alabama-Tombigbee Rivers Coalition v. Dep't of the Interior*, 26 F.3d 1103 (11th Cir. 1994). In *Alabama-Tombigbee*, the Eleventh Circuit upheld an injunction prohibiting the agency from completing or relying on a report produced by an advisory committee in violation of FACA. *Alabama-Tombigbee* was filed before the unlawful advisory committee published its report. *Id.* at 1105. Moreover, the injunctive relief was not directed at a final agency action that had relied on the advisory committee report, but at the report itself. Plaintiffs here are seeking far more than the preclusion of the use of information that they claim was generated in violation of FACA. They are seeking to set aside an agency decision that utilized that information in its entirety, irrespective of the role of that information in the Forest Service's decisions.

Where a court determines that an advisory committee has been established without following procedural requirements, it has required release of information produced by the committee in accordance with FACA. *Heartwood, Inc.*, 431 F. Supp. 2d 28 (D.D.C. 2006). However, as noted in *Alabama-Tombigbee* many courts are reluctant to impose any remedy for violation of FACA procedures. *Alabama-Tombigbee*, 26 F.3d at 1106 n.8 (*citing Public Citizen v. Nat'l Advisory Comm.*, 886 F.2d 419 (D.C. Cir. 1989); *Nat'l Nutritional Foods Ass'n v. Califano*, 603 F.2d 327 (2nd Cir. 1979). The determination of appropriate relief should be based on consideration of whether the relief would promote FACA's purposes. *Cal. Forestry Assoc. v. Forest Service*, 102 F.3d 609, 614 (C.A.D.C. 1996) recognized that prohibiting the Forest Service from using a report in which there had been a substantial investment would require the commissioning of a new report, and would not further FACA's purposes aim to reduce wasteful expenditures. *Id.* That court also found that FACA's purpose of enhancing public accountability may have been addressed by public disclosure of the committee's proceedings. *Id.*

In *Idaho Farm Bureau v. Babbitt*, 900 F. Supp. 1349 (D. Idaho 1995), this Court found that a decision of the U.S. Fish and Wildllife Service listing mollusks under the Endangered Species Act should not be invalidated for violation of FACA. This Court stated that "'once a committee has served its purpose, courts generally have not invalidated the agency action even if there were earlier FACA violations.'" *Id.* at 1365 (*quoting Seattle Audubon Society v. Lyons*, 871 F. Supp. 1291, 1309 (W.D. Wash. 1994)). In reaching this conclusion, the Court noted that applicable procedures afford ample opportunity to correct infirmities resulting from improper advisory committee action prior to taking action. *Id.* This Court further distinguished the award of relief in *Alabama-Tombigbee,* observing that a restraining order had been sought and obtained *before* the report was distributed and used by the government. *Idaho Farm Bureau*, 900 F. Supp. at 1366. In *Idaho Farm Bureau Federation,* as in this case, plaintiffs were seeking to set aside an entire agency action on the basis that information compiled by an advisory committee in violation of FACA had been utilized at some point in the decision process. The Court properly

denied that relief. In *Nw. Forest Council v. Espy*, 846 F. Supp. 1009 (D.D.C. 1994), the court also declined to grant injunctive relief for violation of FACA, finding that doing so would "exceed the injury to be redressed." *Id.* at 1015.

Discomfort with awarding injunctive relief for violation of FACA can be traced to the Supreme Court's decision in *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989). The Supreme Court expressed a high degree of skepticism as to the constitutionality of FACA under the separation of powers doctrine. The Court avoided ruling on the constitutional question by an admittedly strained exercise in statutory construction. Nonetheless, significant discomfort appears to remain regarding the propriety of Congress imposing constraints on the sources of information that may be utilized by the executive branch. *See Nw. Forest Res. Council*, 846 F. Supp 1009, 1015 (D.D.C. 1994).

The relief sought by Plaintiffs is not mandated by FACA or any other federal law. To set aside a final agency action for a violation of FACA that produced only some of the information relied upon by the agency would be unprecedented. Even prohibiting use of information compiled in violation of FACA would be unusual, particularly after the information has been finalized by the agency and circulated for public disclosure and comment.

### 2. The Relief Sought Would Not Advance the Purposes of FACA

#### a. The Purposes of FACA

The purposes of FACA are set forth in 5 U.S.C. App. 2 § 2(b), and generally include the following:

> (1) Advisory committees should only be used when necessary and the number kept to a minimum;
> (2) Advisory committees should be promptly terminated;
> (3) Advisory committees should follow standard procedures;
> (4) The public and Congress should be kept informed of the activities of advisory committees; and
> (5) Advisory committees should not usurp the decision making functions of agencies.

The Forest Service did not follow the formal process for establishing advisory committees that would have been required if FACA applied to the Expert Panel and the Science

Panel. However, as indicated above and acknowledged by Plaintiffs, the work of these two groups has been subjected to intense public comment and scrutiny. Moreover, the Forest Service's decision making was not turned over to these groups. The Forest Service made its own independent decisions regarding administration of Plaintiffs' permits, and the Forest Service continues to work on the longer-term decision regarding revisions of the Forest Plan, with extensive public participation.

Plaintiffs have not been deprived of access to the information utilized by the Forest Service, and have had amply opportunity to scrutinize and comment on that information. The Risk Analysis has been available to the public for over two years, and the Science Panel review has been available for nearly that long. Both were available to Plaintiffs in the administrative process that affected their permits. The information has been subjected to critical review from the agriculture industry, and their comments have been considered, and are currently under consideration in the ongoing environmental analysis. The work of both panels can in no way be characterized as a closed-door backroom dealings that Congress sought to curtail in enacting FACA, or contrary to FACA's purpose.

### b.    Other Information Relied Upon by the Forest Service is Sufficient to Support the Decisions

Prior to the creation of the groups that created the Risk Analysis and Payette Principles, the Chief of the Forest Service determined that, based on existing information, the viability of bighorn sheep populations within the Hells Canyon area appeared to be threatened by continued grazing of domestic sheep in or near occupied bighorn sheep habitat. PP000664. Further, the Chief found that bighorn sheep are at risk of extirpation if domestic sheep were not removed, and the entire Hell's Canyon and Payette National Forest population was at risk. PP000677. The Regional Forester was directed to conduct further analysis to evaluate these concerns. The Expert Panel and the Science Panel were convened in response to this direction, but the concerns

for the potential harm to bighorn sheep populations already existed based on available information.

In part, the Chief's concern was due to lack of adequate analysis and data to demonstrate that the bighorn sheep populations were *not* at serious risk from domestic sheep grazing. That was because, at the time, existing information indicated a serious threat to the bighorn sheep. The Risk analysis confirmed that the Chief's concern was warranted. As explained above, the Expert Panel that developed the Risk Analysis was clearly exempt from FACA, and there is no basis to challenge that report, or the Forest Service's reliance on the Risk Analysis.

Ironically, the Science Panel was formed specifically to address concerns voiced by the livestock industry that the Risk Analysis was flawed, and the expertise of the group that produced the Risk Analysis was too narrow. Accordingly, the Forest Service invited a panel of scientists from the disciplines of wildlife biology, veterinary medicine, and agriculture to review the Risk Analysis, as Plaintiffs requested. Now they do not like the result, and seek to preclude use of the information. Regardless, much of the information provided by the Science Panel was not the result of any consensus of advice provided by the scientists, but was existing research and data compiled and reviewed by the participants. AR001102-06; AR003952-54.

Preventing the Forest Service from taking action to maintain separation of the species, notwithstanding the overwhelming evidence of risk to bighorn sheep from sources in addition to the Risk Analysis and Science Panel review, would in no way further the purposes of FACA. There is no indication that Congress intended FACA to be used as a technical, procedural device to cause agencies to disregard credible scientific data.

In their underlying cause of action, Plaintiffs seek to challenge Forest Service conclusions based on conflicting and uncertain scientific evidence. The Forest Service has repeatedly acknowledged that the precise mechanisms for disease transmission from domestic sheep to bighorn sheep are not fully understood, nor is bighorn sheep mortality from respiratory diseases. The Forest Service record is also replete with scientific literature indicating that contact with

domestic sheep places bighorn sheep at risk of mortality from respiratory disease, and that managing domestic sheep to maintain separation from bighorn sheep is the prudent thing to do to protect the bighorns. The literature also indicates that there is at least the potential for catastrophic die offs of bighorns if separation is not maintained.

The ultimate question in this lawsuit is whether the actions undertaken by the Forest Service to separate domestic and bighorn sheep were reasonable in light of the totality of information available to the Forest Service. In the pending motion, Plaintiffs assert that if any snippet of information relied upon by the Forest Service is suspect, then its decisions must be set aside in their entirety. The consequences of this would be borne by the bighorn sheep who would be placed at risk of death. Before setting aside a Forest Service decision, the Court must look at the whole of the administrative record that was before the agency, and only then determine if the agency actions were reasonable. Even if FACA had been violated, which the Forest Service disputes, the Court should not ignore information generated by the Panels, and disregard the information before the agency that was generated independently.

The Court should defer to the agency in determining the adequacy of scientific evidence. To do otherwise would ignore the APA's arbitrary and capricious standard of review. *Lands Council v. McNair,* 537 F.3d 981, 992 (9th Cir. 2008). The proper role of the court ". . . is simply to insure that the Forest Service made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" *Id.* at 993. "We are to be 'most deferential' when the agency is 'making predictions. within its [area of] special expertise, at the frontiers of science.'" *Id.* at 993-94 (*quoting Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089, 1099 (9th Cir. 2003)).

Setting aside the Forest Service decisions regarding Plaintiffs grazing permits, based solely on the exclusion of information generated by the Expert Panel and Science Panel, would preclude the Court from exercising the appropriate standard of review of those decisions. The Court should consider the totality of information that was before the agency, defer to agency expertise, and only void the Forest Service's decisions based upon a "clear error of judgment."

## V.   CONCLUSION

The Court has considered and denied this FACA challenge in Case No. 07-151.  The claims before this Court are now barred.  Further, the Forest Service did not violate FACA by utilizing the Expert Panel or Science Panel.  Both these groups are exempt from FACA.  Even if a violation had occurred, Plaintiffs would not be entitled to the relief they are seeking.  Setting aside the Forest Service decisions would not further the purposes of FACA, and would disregard the considerable independent body of information relied upon by the Forest Service that was not produced by the Expert Panel or Science Panel.  Accordingly, Plaintiffs' Motion for Summary Judgment should be denied.

DATED this 26th day of March, 2009.

THOMAS E. MOSS
United States Attorney


DEBORAH A. FERGUSON
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on 26th day of March, 2009, the **U.S. FOREST SERVICE'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

William Gerry Myers, III
wmyers@hollandhart.com

*Angela R. Nyleh*