WILLIAM G. MYERS III (ISB #5598)
Holland & Hart, LLP
800 West Main St., Suite 1750
Boise, ID 83702
Tel:    (208) 342-5000
Fax:    (208) 343-8869
Email: wmyers@hollandhart.com

ANDREW A. IRVINE (*pro hac vice application pending*)
Andrew A. Irvine, P.C.
P.O. Box 3221
Jackson, WY 83001
Tel:    (307) 690-8383
Fax:    (307) 333-0383
Email: andy@andrewirvinelaw.com

ATTORNEYS FOR PLAINTIFF IDAHO WOOL
GROWERS ASSOCIATION AND MOVANT-PLAINTIFF
NORTH AMERICAN PACKGOAT ASSOCIATION

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IDAHO WOOL GROWERS ASSOCIATION, and NORTH AMERICAN PACKGOAT ASSOCIATION (*Rule 71 motion pending*), | ) ) ) ) | Case No. 08-cv-00394 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| THOMAS VILSACK, in his official capacity as Secretary of the United States Department of Agriculture, THOMAS TIDWELL, in his official capacity as Chief of the United States Forest Service, and UNITED STATES FOREST SERVICE, | ) ) ) ) ) ) | **MEMORANDUM IN SUPPORT OF MOTION FOR ORDER HOLDING DEFENDANTS IN CONTEMPT OF COURT** |
| Defendants. | ) ) ) | |

## Table of Contents

INTRODUCTION ..................................................................................................1

STANDARD OF REVIEW ...................................................................................5

ARGUMENT .........................................................................................................6

   I.   The Forest Service Violated the Court's Orders. ...................................6

      A. The Court's Orders prohibited the Forest Service from relying on the Findings and Conclusions of the Payette RADT and Payette Principles Committees in future agency decisions. ........................................................................6

      B. The Forest Service relied directly on the Findings and Conclusions of the Payette RADT and Payette Principles Committees to prepare the Shoshone RADT Report. ..........................................................................8

      C. The Forest Service repeated the Payette RADT Committee's risk assessment to develop the Shoshone RADT Committee's risk assessment. .........................................10

   II.  Sanctions are Appropriate to Compensate the Wool Growers and Goatpackers and to Coerce the Forest Service to Obey the Court's Orders. ..................................14

CONCLUSION .....................................................................................................18

## Table of Authorities

**Federal Rules of Civil Procedure**

Fed.R.Civ.P. 70(e) ....................................................................................................5

**Statutes**

5 U.S.C. App. 2, §§ 1-16 ...........................................................................................1

16 U.S.C. §§ 1600-1614 ............................................................................................1

**Cases**

*Ahearn v. Int'l Longshore & Warehouse Union,* 721 F.3d 1122 (9th Cir. 2013) ...........................6

*Balla v. Idaho State Bd. of Corrections,* 869 F.2d 461 (9th Cir. 1989)............................................5

*Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.,* 530 F. Supp. 2d 1126 (D. Mont. 2008) .....................................................................................................................................18

*Gen. Signal Corp. v. Donallco, Inc.,* 787 F.2d 1376 (9th Cir. 1986) ........................................6, 17

*Harcourt Brace v. Multistate Legal Studies,* 26 F.3d 948 (9th Cir. 1994)...............................6, 17

*Idaho Wool Growers Ass'n v. Schafer,* 2009 WL 3806371 (D. Idaho 2009) .......................passim

*Idaho Wool Growers Ass'n v. Schafer,* 637 F. Supp. 2d 868 (D. Idaho 2009).....................passim

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.,* 10 F.3d 693 (9th Cir. 1993) .......5, 6, 7

*In re Dyer,* 322 F.3d 1178 (9th Cir. 2003) ..............................................................................6, 17

*Kelly v. Wengler,* 979 F. Supp. 2d 1104, 1108 (D. Idaho 2013) ..................................5, 6, 7, 14, 15

*SEC v. Hickey,* 322 F.3d 1123 (9th Cir. 2003) ..............................................................................6

*Shillitani v. U.S.,* 384 U.S. 364 (1966) .........................................................................................5

*U.S. v. Asay,* 614 F.2d 655 (9th Cir. 1980).............................................................................15, 17

## List of Exhibits

Exhibit 1.    July 1, 2009 Order: *Idaho Wool Growers Ass'n v. Schafer*, 637 F. Supp. 2d 868 (D. Idaho 2009).

Exhibit 2.    November 9, 2009 Order: *Idaho Wool Growers Ass'n v. Schafer*, 2009 WL 3806371 (D. Idaho 2009).

Exhibit 3.    Payette RADT Report:  Payette NF, "Risk Analysis of Disease Transmission Between Domestic Sheep and Bighorn Sheep on the Payette National Forest," Feb. 6, 2006.

Exhibit 4.    Payette Principles Report: Payette NF, "Summary of the Science Panel Discussion," Nov. 27, 2006.

Exhibit 5.    Shoshone RADT Report (2012 version):  Shoshone NF, "Risk Analysis of Disease Transmission between Domestic Sheep and Goats and Rocky Mountain Bighorn Sheep," Apr. 2012.

Exhibit 6.    Shoshone RADT Report (2013 version):  Shoshone NF, "Risk Analysis of Disease Transmission between Domestic Sheep and Goats and Rocky Mountain Bighorn Sheep," June 2013.

Exhibit 7.    E-mail from Olga Troxel, Land Management Specialist, Shoshone NF, to Andrew A. Irvine, Andrew A. Irvine, P.C. (May 28, 2015, 14:24 MST).

Exhibit 8.    Shoshone LMP:  Shoshone NF, "Land Management Plan 2015 Revision," May 2015.

Exhibit 9.    Letter from Joseph Alexander, Forest Supervisor, Shoshone NF, to Reader, May 6, 2015.

Exhibit 10.    Shoshone ROD:  Shoshone NF, "Record of Decision for the Land Management Plan Revision," May 2015.

Exhibit 11.    Shoshone FEIS:  Shoshone NF, "Final Environmental Impact Statement, Shoshone National Forest Land Management Plan Revision," May 2015.

Exhibit 12.    Shoshone Objection Response:  Shoshone NF, "Objection Response for the Shoshone National Forest Land Management Plan," Dec. 2014.

Exhibit 13.    Shoshone 2015 BE:  Shoshone NF, "2015 Amendment to the 2013 Biological Evaluation for the Revised Shoshone National Forest Land Management Plan," Mar. 2015.

Exhibit 14.    Table of Shoshone RADT Report Passages Copied Directly from the Payette RADT Report.

Exhibit 15.    Payette FSEIS:  Payette NF, "Final Supplemental Environmental Impact Statement for the Southwest Idaho Ecogroup Land and Resource Management Plans," July 2010.

Exhibit 16.    Payette NF, "Bighorn Sheep:  Supplemental Analysis to the Forest Plan Environmental Impacts Statement—Combined Team Meeting," Aug. 18-19, 2009.

Exhibit 17.    Table of Similarities Between the Shoshone RADT Committee's Risk Assessment and the Payette RADT Committee's Risk Assessment.

Exhibit 18.    Goatpackers' Comments:  Goatpackers, "Comments on the July 2012 Draft Environmental Impact Statement and Draft Land Management Plan for the Shoshone National Forest Land Management Plan Revision," Oct. 12, 2012.

Exhibit 19.    Goatpackers' Objections:  Goatpackers, "Objections to the Shoshone Land Management Plan Draft Decision," Mar. 20, 2014.

Exhibit 20.    Shoshone Objector Meeting:  Transcript of Proceedings:  Shoshone National Forest Objector Meeting, Oct. 8, 2014.

The Idaho Wool Growers Association ("Wool Growers") by and through its attorneys,

Holland & Hart, LLP, and the North American Packgoat Association ("Goatpackers") by and

through its attorney, Andrew A. Irvine, P.C., submit this memorandum in support of their motion

to hold Defendants (collectively "Forest Service") in contempt of court.[1]

## INTRODUCTION

The Court's July 1, 2009 Order (ECF No. 37) in this case declared two bighorn sheep

science committees, the Payette RADT and Payette Principles Committees, were advisory

committees subject to the procedural mandates of the Federal Advisory Committee Act

("FACA"), 5 U.S.C. App. 2, §§ 1-16, and the National Forest Management Act ("NFMA"),

16 U.S.C. §§ 1600-1614. *Idaho Wool Growers Ass'n v. Schafer*, 637 F. Supp. 2d 868, 880

(D. Idaho 2009) (attached as Ex. 1). As a result, the Court ordered "the Committees' findings

and/or conclusions are not to be relied upon by the Forest Service with respect to any future

agency decisions," and held unlawful and set aside the Committees' reports—the "Payette

RADT Report"[2] and the "Payette Principles Report."[3] *Id.* The Court's November 9, 2009

Memorandum Decision and Order (ECF No. 46) clarified that the Forest Service must not

"'grandfather'" the Committees' findings and/or conclusions or otherwise "rely upon the

Committees' findings and/or conclusions in reaching future agency decisions—either directly or

indirectly." *Idaho Wool Growers Ass'n v. Schafer*, 2009 WL 3806371, at *2 (D. Idaho 2009)

---

[1] Pursuant to Fed.R.Civ.P. 25(d) the names of current public officers have been substituted for the names of former officers. Plaintiff Dr. Marie S. Bulgin and Defendant Suzanne C. Rainville have been removed, as they are not involved in this phase of the case. Movant-Plaintiff Goatpackers has been added, pending its motion to join as a plaintiff.

[2] Payette National Forest ("Payette NF"), "Risk Analysis of Disease Transmission Between Domestic Sheep and Bighorn Sheep on the Payette National Forest" (attached as Ex. 3), Feb. 6, 2006.

[3] Payette NF, "Summary of the Science Panel Discussion" (attached as Ex. 4), Nov. 27, 2006.

(attached as Ex. 2), *appeal voluntarily dismissed, Idaho Wool Growers Ass'n v. Vilsack*, Case No. 10-35126 (9th Cir. Nov. 3, 2010).

In contravention of the Court's Orders, the Forest Service on the Shoshone National Forest ("Shoshone NF") in northwest Wyoming has relied directly on the Payette RADT and Payette Principles Committees' reports to establish and utilize a bighorn sheep science committee—the "Shoshone RADT Committee"—as part of its land management plan revision. The Forest Service used the Payette RADT and Payette Principles Reports to prepare the Shoshone RADT Committee's report—the "Risk Analysis of Disease Transmission between Domestic Sheep and Goats and Rocky Mountain Bighorn Sheep" ("Shoshone RADT Report").[4] *See, e.g.*, Shoshone RADT Report at 3, 4, 12, 13, 19-20 (citing Payette RADT and Payette Principles Reports).

Moreover, the Forest Service relied on the Payette RADT Committee's analysis to conduct a similar risk analysis and assessment on the Shoshone NF. The Forest Service confirms its reliance on the Payette RADT Report to prepare the Shoshone RADT Committee's risk analysis and assessment by admitting "the same basic outcomes, with the addition of domestic pack goats, identified by the Payette National Forest (USDA Forest Service 2006a) and used in the Payette's risk assessment, are utilized in this risk assessment." *Id.* at 12 (citing Payette

---

[4] Shoshone NF, "Risk Analysis of Disease Transmission between Domestic Sheep and Goats and Rocky Mountain Bighorn Sheep" (attached as Ex. 5), Apr. 2012; *see also* Shoshone NF, "Risk Analysis of Disease Transmission between Domestic Sheep and Goats and Rocky Mountain Bighorn Sheep," June 2013 (attached as Ex. 6). The Shoshone NF prepared two versions of the Shoshone RADT Report, one dated April 2012 and the other dated June 2013. The June 2013 version was not referenced by the Forest Service in developing the Shoshone NF land management plan revision and was not provided to the public. *See* E-mail from Olga Troxel, Land Management Specialist, Shoshone NF, to Andrew A. Irvine, Andrew A. Irvine, P.C. (May 28, 2015, 14:24 MST) (attached as Ex. 7) (explaining that June 2013 version was "inadvertently omitted from the record"). Both versions contain the same language pertaining to violations of the Court's Orders. The April 2012 version is referenced herein.

RADT Report as "USDA Forest Service 2006a")[5] (emphasis added). In fact, large portions of the Shoshone RADT Report are copied verbatim from the Payette RADT Report. In every way, from its reasoning for conducting the Shoshone RADT Committee's risk assessment, to the principal assumptions underlying the assessment, to application of the assessment, and finally to the findings and conclusions of the assessment, the Forest Service relied upon the Payette RADT and Payette Principles Committees.

The Forest Service used the tainted Shoshone RADT Report as the primary justification for banning domestic sheep and goats (including packgoats) from the Shoshone NF through the Shoshone NF Revised Land and Resource Management Plan. *See* Shoshone NF, "Land Management Plan 2015 Revision" ("Shoshone LMP," attached in pertinent part as Ex 8.), at 45-49, 51, 120, May 2015 (discussing ban on "domestic sheep and/or goat use"); Letter from Joseph Alexander, Forest Supervisor, Shoshone NF, to Reader, May 6, 2015 (attached as Ex. 9) (highlighting decision to "[r]emove recreational pack goat use from the majority of the Forest"); Shoshone NF, "Record of Decision for the Land Management Plan Revision" ("Shoshone ROD," attached in pertinent part as Ex. 10), at 8-9, May 2015 (discussing "decision to prohibit pack goats on the majority of the Shoshone National Forest").

The Shoshone ROD and Final Environmental Impact Statement for the Shoshone LMP ("Shoshone FEIS")[6] show that the Shoshone RADT Report provided the linchpin for the Forest Service's decision to ban domestic sheep and goats (including packgoats) from the Shoshone NF. The Shoshone RADT Report provided the Forest Service's only assessment of the alleged risks to wild bighorn sheep from domestic sheep and goats. *See* Shoshone ROD at 30 ("The

---

[5] *See* Shoshone RADT Report at 19.

[6] Shoshone NF, "Final Environmental Impact Statement, Shoshone National Forest Land Management Plan Revision" (attached in pertinent part as Ex. 11), May 2015.

[Shoshone RADT Report] provides a thorough assessment of the risks to wild sheep from domestic sheep and goats.").[7] The Shoshone RADT Report was the Forest Service's sole basis for rejecting reasonable alternatives in the Shoshone FEIS, such as an alternative employing best management practices to allow packgoat use on the Shoshone NF. *See* Shoshone FEIS at 53 (citing Shoshone RADT Report).[8] Finally, lacking any scientific literature about the risk of disease transmission between packgoats and bighorn sheep, and without a single instance of disease transmission from domestic sheep or goats on the Shoshone NF, the Shoshone RADT Report provided the Forest Service's only basis for concluding that domestic sheep and goats (including packgoats) pose a catastrophic risk of disease transmission to wild bighorn sheep and therefore must be banned from the Shoshone NF. *See* Shoshone FEIS at 224 (citing Shoshone RADT Report); *see also id.* at 771 (citing Shoshone RADT Report); *id.* at 226 (citing Shoshone RADT Report). Thus, in direction violation of the Court's Orders, through the Shoshone RADT Report, the findings and conclusions of the Payette RADT and Payette Principles Committees were relied upon by the Forest Service to ban domestic sheep and goats (including packgoats) on the Shoshone NF.

Although the Court need not establish intent to find the Forest Service in civil contempt, the Forest Service's violation of the Court's Orders on the Shoshone NF was willful and

---

[7] *See also* Shoshone ROD at Response to Objection Instruction F-1 (citing Shoshone RADT Report); Shoshone NF, "Objection Response for the Shoshone National Forest Land Management Plan" ("Shoshone Objection Response," attached in pertinent part as Ex. 12), at Attach. 2, 51-52, 54, Dec. 2014; Shoshone NF, "2015 Amendment to the 2013 Biological Evaluation for the Revised Shoshone National Forest Land Management Plan" ("Shoshone 2015 BE," attached in pertinent part as Ex. 13), at 14-15, Mar. 2015; Shoshone FEIS at 771 ("Information from the [Shoshone RADT Report] was considered for this analysis") (citing Shoshone RADT Report); *id.* at 782 ("Available relevant information was considered for this analysis.") (citing Shoshone RADT Report).

[8] *See also* Shoshone FEIS at 767 (same) (citing Shoshone RADT Report); Shoshone ROD at Response Objection Instruction F-4 (similar) (citing Shoshone RADT Report).

deserving of sanctions.  Both the Chief of the Forest Service and the Forest Service itself were named defendants on the Orders.  Prior to the Shoshone ROD and FEIS, the Goatpackers repeatedly notified the Forest Service of the Court's Orders and detailed the Forest Service's violation of the Orders.  Still, the Forest Service relied on the findings and conclusions of the Payette RADT and Payette Principles Committees and used the illegal Committee reports to ban domestic sheep and goats (including packgoats) from the Shoshone NF through the Shoshone LMP.  *See* Shoshone LMP at 45-49, 51, 120 (discussing ban).

As a result, and to compel the Forest Service's compliance with the Court's Orders, the Wool Growers and Goatpackers respectfully request that the Court hold the Forest Service in contempt of its Orders and hold unlawful and set aside the Shoshone RADT Committee and its Report.  The Wool Growers and Goatpackers also request the Court sanction the Forest Service to compensate the Wool Growers and Goatpackers for their fees and costs in bringing this action and to coerce the Forest Service to comply with the Court's Orders.

## STANDARD OF REVIEW

Pursuant to Fed.R.Civ.P. 70(e), the Court may "hold the disobedient party in contempt." Furthermore, "courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. U.S.*, 384 U.S. 364, 370 (1966).  The purpose of civil contempt is to coerce compliance with a court order or to compensate another party for the harm caused by the contemnor.  *Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1108 (D. Idaho 2013) (citation omitted).

The contempt must be shown by clear and convincing evidence.  *Kelly*, 979 F. Supp. 2d at 1108 (citation omitted); *Balla v. Idaho State Bd. of Corrections*, 869 F.2d 461, 466 (9th Cir. 1989) (citation omitted).  Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993); *see*

*also Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986) ("Civil contempt

occurs when a party fails to comply with a court order." (citations omitted)).

"A court has wide latitude in determining whether there has been contemptuous defiance

of its order." *Kelly*, 979 F. Supp. 2d at 1108 (quotation omitted). The contempt "need not be

willful," and there is no good faith exception to the requirement of obedience to a court order. *In*

*re Dual-Deck*, 10 F.3d at 695 (quotation omitted); *see also Gen. Signal Corp.*, 787 F.2d at 1379

(citations omitted). Further, "courts in civil contempt proceedings may proceed in a 'more

summary fashion' than in an 'independent civil action.'" *Ahearn v. Int'l Longshore &*

*Warehouse Union,* 721 F.3d 1122, 1130 (9th Cir. 2013) (quotation omitted).

Courts also have "broad equitable power to order appropriate relief in civil contempt

proceedings." *Kelly*, 979 F. Supp. 2d at 1108 (quoting *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th

Cir. 2003) (citation omitted)). "Sanctions for civil contempt may be imposed to coerce

obedience to a court order, or to compensate the party pursuing the contempt action for injuries

resulting from the contemptuous behavior, or both." *Gen. Signal Corp.*, 787 F.2d at 1379

(citations omitted). "[A]ttorneys' fees are an appropriate component of a civil contempt award."

*In re Dyer*, 322 F.3d 1178, 1195 (9th Cir. 2003) (citation omitted); *Harcourt Brace v. Multistate*

*Legal Studies*, 26 F.3d 948, 953 (9th Cir. 1994) ("An award of attorney's fees for civil contempt

is within the discretion of the district court." (citation omitted)).

## ARGUMENT

**I.     The Forest Service Violated the Court's Orders.**

    **A.     The Court's Orders prohibited the Forest Service from relying on the Findings and Conclusions of the Payette RADT and Payette Principles Committees in future agency decisions.**

The Court's July 1, 2009 Order prohibited the Forest Service's use of the Payette RADT

and Payette Principles Reports "in any future agency decision." *Idaho Wool Growers Ass'n*, 637

F. Supp. 2d at 868, 878, 880.  The Court's November 9, 2009 Order clarified what the Forest Service had to do to comply with the Court's July 1, 2009 Order.  *See Idaho Wool Growers Ass'n*, 2009 WL 3806371, at *4.  The Court explained that the Forest Service must not "'grandfather' the Committees findings to support any decision." *Id.* at *2.  The Court elaborated: "[s]imply put, and consistent with the Court's existing directive, the Forest Service may not rely upon the Committees' findings and/or conclusions in reaching future agency decisions—either directly or indirectly . . . .  Otherwise, the Court's Order is rendered meaningless." *Id.*; *see also id.* *3 (future documents must "be drafted independent of the Committees' recommendations").

Here, unless the Court holds the Forest Service in contempt, the Court's Orders will be "rendered meaningless." *Id.* at *2.  The Court's Orders were specific and definite—"[t]he Forest Service may not rely upon the Committees' findings and/or conclusions in reaching future agency decisions." *Id.* at *4; *Idaho Wool Growers Ass'n*, 637 F. Supp. 2d at 868, 878, 880 (similar).  Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *In re Dual-Deck*, 10 F.3d at 695; *see also Kelly*, 979 F. Supp. 2d at 1108.  Not only did the Forest Service fail to take "all reasonable steps" to comply with the Court's Orders on the Shoshone NF, it failed to take <u>any</u> steps to comply.  Instead, the Forest Service knowingly and willfully disobeyed the Court's Orders by relying on the findings and conclusions of the Payette RADT and Payette Principles Committees to prepare the Shoshone RADT Report and reach agency decisions on the Shoshone NF.

**B.**     **The Forest Service relied directly on the Findings and Conclusions of the Payette RADT and Payette Principles Committees to prepare the Shoshone RADT Report.**

The Forest Service relied directly on the Payette RADT and Payette Principles Committees' findings and conclusions to establish and utilize the Shoshone RADT Committee, to conduct the Committee's risk analysis and assessment, and to reach the conclusions and recommendations in the Shoshone RADT Report.

The Forest Service relied directly on the Payette RADT and Payette Principles Reports by citing both reports in the "Literature Cited" section of the Shoshone RADT Report. *See* Shoshone RADT Report at 19-20.[9][10]  The Forest Service also cites directly to the reports in the body of Shoshone RADT Report. *See id.* at 3, 4, 12, 13.

Additionally, the Shoshone RADT Report is copied directly from the Payette RADT Report, except the Shoshone RADT Report not only contemplates disease transmission from domestic sheep to bighorn sheep, but also disease transmission from domestic goats (including packgoats) to bighorn sheep.  The Wool Growers and Goatpackers have excerpted in a table, Ex. 14, some of the Shoshone RADT Report passages that were copied directly from the Payette RADT Report.

As shown in the "Background" section in the table, Ex. 14, the Forest Service on the Shoshone NF repeated the Payette RADT Committee's analysis of the effects of disease transmission.  The Forest Service's only substantial change to the Payette RADT Committee's

---

[9] The Shoshone RADT Report directly cites to the Payette RADT Report as follows: "U.S. Department of Agriculture-Forest Service (USDA-FS).  2006a.  Risk analysis of disease transmission between domestic sheep and bighorn sheep on the Payette National Forest.  USDA Forest Service.  Intermountain Region.  Payette National Forest."  Shoshone RADT Report at 19.

[10] The Shoshone RADT Report directly cites to the Payette Principles Report as follows: "____. 2006b.  Summary of Science Panel Discussion on Disease Transmission between Domestic Sheep and Bighorn Sheep on the Payette National Forest.  Boise, Idaho.  24 pp., http://www.fs.fed.us/r4/payette/publications/index."  Shoshone RADT Report at 20.

analysis was to add a superficial analysis of domestic goats.  In adding the two phrases—"or goats" and "and goats"—to the Payette RADT Report's findings and conclusions on the "Effects of Disease on Bighorn Populations" (shown in the table, Ex. 14),[11] the Forest Service failed to add a single new cite to support application of the Payette RADT Report's findings and conclusions on the "Effects of Disease on Bighorn Populations" to domestic goats (including packgoats).  *Compare* Payette RADT Report at 3 to Shoshone RADT Report at 2.  Thus, there was no additional or independent scientific basis for the findings and conclusions on the "Effects of Disease on Bighorn Populations" in the Shoshone RADT Report; rather, the Forest Service just copied the section from the Payette RADT Report and added the phrases—"or goats" and "and goats"—so the section would appear to apply to domestic goats.  In addition, as shown in the table, Ex. 14, and again without any additional or independent scientific basis, the Forest Service relied on fundamental findings from the Payette RADT Report concerning the impacts of pneumonia outbreaks on bighorn sheep and the susceptibility of bighorn sheep to disease to develop the Shoshone RADT Report.  *See* Payette RADT Report at 3; Shoshone RADT Report at 3.  These Payette RADT Committee findings provided support for the Forest Service's removal of domestic sheep and goats on the Shoshone NF.

Further, the Forest Service cited the Payette RADT Report for the foray distance for bighorn rams on the Shoshone NF:

> [a]lthough the foray distance for bighorn rams on the Shoshone is not known, the data compiled by the Payette National Forest (USFS 2006a) could be used to represent the potential foray

---

[11] The Forest Service added the phrase "or goats" to the statement:  "bighorn die-offs typically follow known or suspected contact with domestic sheep *or goats*."  Shoshone RADT Report at 2 (emphasis added).  Likewise, the Forest Service added the phrase "and goats" to the statement: "there is consensus among wildlife biologists and veterinarians experienced in bighorn sheep management that domestic sheep *and goats* and bighorn sheep must be kept separated in order to maintain healthy bighorn populations."  *Id.* (emphasis added).

> distance on the Shoshone. They found that most sheep forayed
> from 0-26 km outside of their core home range with the longest
> foray being 35 km.

Shoshone RADT Report at 13 (citing Payette RADT Report as "USFS 2006a"). The Forest

Service does not cite to the "data compiled by the Payette National Forest," nor does it provide

any independent basis for the statement above. *See also* Shoshone 2015 BE at 15 (indicating that

26 km foray distance from the Payette RADT Report was used in the Shoshone RADT Report).

Notably, this foray distance from the Payette NF formed the basis for the Forest Service's

management recommendation on the Shoshone NF:

> Close all occupied core native bighorn sheep habitat and the area
> within 26 km of the occupied core native habitat to domestic goat
> (includes pack goat) use. . . . The closure for the 26 km buffer is
> to protect foraying bighorn sheep from coming into contact with
> domestic goats. This measure effectively closes the entire
> Shoshone National Forest . . . .

Shoshone RADT Report at 15.

As the above comparisons and Ex. 14 demonstrate, the Forest Service's decision to close

the Shoshone NF to sheep and goat use is based on the Payette RADT Report. The Forest

Service violated the Court's Orders prohibiting the Forest Service from relying on the findings

and conclusions of the Payette RADT Committee in any future agency decision. *See Idaho Wool*

*Growers Ass'n*, 2009 WL 3806371, at *4 ("[t]he Forest Service may not rely upon the

Committees' findings and/or conclusions in reaching future agency decisions"); *Idaho Wool*

*Growers Ass'n*, 637 F. Supp. 2d at 880 (same).

**C.    The Forest Service repeated the Payette RADT Committee's risk assessment
to develop the Shoshone RADT Committee's risk assessment.**

The Forest Service convened the Payette RADT Committee in 2006 to "provide decision

makers with information on the likelihood of disease transmission from domestic sheep to

bighorn sheep" on the Payette NF. Payette RADT Report at 10. At the time, the Forest Service

chose to conduct a qualitative assessment of the risk of disease transmission from domestic sheep

to bighorn sheep on the Payette NF because it lacked quantitative models available to predict

such risk. *Id.* ("[w]e know of no quantitative models available to predict the likelihood of

disease outbreak in bighorn sheep populations due to potential contact with domestic sheep").

Six years later, in 2012, the Forest Service convened the Shoshone RADT Committee

based on similar reasoning: to provide decision makers with information on "the likelihood of

disease transmission from domestic sheep and goats (including pack goats) to bighorn sheep" on

the Shoshone NF. Shoshone RADT Report at 12. Just as it did in 2006 on the Payette NF, the

Forest Service on the Shoshone NF chose to conduct a qualitative assessment of the risk of

disease transmission from domestic sheep and goats to bighorn sheep because of a "lack of

quantitative models available" to predict such risk. *Id.* Because of this, the Forest Service

repeated the Payette RADT Committee's risk assessment on the Shoshone NF. The Forest

Service stated, "[b]ecause of the lack of quantitative models available to predict likelihood of

disease outbreak in bighorn sheep populations due to potential contact with domestic sheep or

goats (including pack goats), the same basic outcomes, with the addition of domestic pack goats,

identified by the Payette National Forest (USDA Forest Service 2006a) and used in the Payette's

risk assessment, are utilized in this risk assessment." *Id.* (emphasis added). The cite "USDA

Forest Service 2006a" is a direct cite to the Payette RADT Report. *See id.* at 19.

The flaw with the Forest Service's reasoning in the Shoshone RADT Report is that

between 2006 and 2012, as a result of the Court's Orders, the Forest Service developed a

quantitative model to predict likelihood of disease outbreak in bighorn sheep populations. As the

Forest Service explained in its July 2010 "Final Supplemental Environmental Impact Statement

for the Southwest Idaho Ecogroup Land and Resource Management Plans" ("Payette FSEIS"):[12]

> [t]he qualitative *Risk Analysis for Disease Transmission Between*
> *Bighorn Sheep and Domestic Sheep on the Payette National Forest*
> (USDA Forest Service 2006) <u>was completely removed from the</u>
> <u>analysis and is no longer utilized in this effort</u>. To assess the risk
> for contact between bighorn sheep and domestic sheep, the Payette
> National Forest developed a <u>quantitative</u> foray analysis to predict
> probabilities of contact.

Payette FSEIS at xvi (emphasis added); *see also id.* at 2-1 ("[t]he quantitative contact analysis

. . . replaces the *Risk Analysis of Disease Transmission Between Domestic Sheep and Bighorn*

*Sheep on the Payette National Forest* (risk analysis) (USDA Forest Service 2006)."); *id.* at 2-4

(similar).[13]

     The Forest Service's quantitative risk assessment for the Payette NF was completed prior

to July 2010, nearly two years before the Forest Service established the Shoshone RADT

Committee and prepared the Shoshone RADT Report. Thus, the Forest Service's reasoning that

a <u>qualitative</u> risk assessment was necessary on the Shoshone NF because of a "lack of

<u>quantitative</u> models available" was based on the outdated finding in the Payette RADT Report,

not on the later quantitative risk assessment completed by the Payette NF. *See* Shoshone RADT

Report at 12.

     While the Forest Service on the Payette NF switched to a quantitative approach to predict

likelihood of disease outbreak in bighorn sheep populations due to potential contact with

domestic sheep or goats on the Payette NF, the Forest Service on the Shoshone NF continued to

---

[12] Payette NF, "Final Supplemental Environmental Impact Statement for the Southwest Idaho
Ecogroup Land and Resource Management Plans" (attached in pertinent part as Ex. 15), July
2010.

[13] *See also* Payette FSEIS at xiii-xvii, 2-1, 2-10 -12, 2-22, 3-99 -100 (discussing "updated
quantitative risk analysis").

rely on the qualitative approach from the discredited and illegal Payette RADT Report. Indeed, the Payette FSEIS and the quantitative approach therein were prepared specifically to respond to the Court's Orders and avoid reliance on the findings and conclusions of the Payette RADT and Payette Principles Committees. *See, e.g.*, Payette FSEIS at xvi; *id.* at 2-1; Payette NF, "Bighorn Sheep: Supplemental Analysis to the Forest Plan Environmental Impacts Statement—Combined Team Meeting" (attached in pertinent part as Ex. 16), at 3, Aug. 18-19, 2009 ("Because of a recent court ruling involving the Payette NF . . . the Forest cannot use the *Risk Analysis of Disease Transmission between Domestic Sheep and Bighorn Sheep on the Payette National Forest* (USDA Forest Service 2006a), *Summary of the Science Panel Discussion* (USDA Forest Service 2006b), . . . during this process."). Still, the Forest Service decided to repeat the Payette RADT Committee's risk assessment on the Shoshone NF. Similarities between the Payette RADT Committee's risk assessment and the Shoshone RADT Committee's risk assessment are presented in a table, Ex. 17.

Finally, as it did for the Payette RADT Committee, the Forest Service assembled an unbalanced panel of scientists for the Shoshone RADT Committee in order to conduct a qualitative risk assessment. *See* Shoshone RADT Report at 12, 21 (indicating committee membership). The Forest Service then employed the exact risk model and methodology for the Shoshone RADT Committee's risk assessment that it employed for the Payette RADT Committee's risk assessment (shown in the table, Ex. 17). The Forest Service even adopted the same principal assumption for the Shoshone RADT Committee's risk assessment, with the addition of goats (including packgoats), which was relied upon by the Forest Service for the Payette RADT Committee's risk assessment (shown in the table, Ex. 17). Unsurprisingly, by duplicating the Payette RADT Committee's risk assessment on the Shoshone NF, the Forest

Service came to the same conclusion on the Shoshone NF that it did on the Payette NF—that

domestic sheep and goats must be kept separated on the Forest. *Compare* Shoshone RADT

Report at 15 to Payette RADT Report at 18.

      Thus, in every way, from its reasoning for using a qualitative risk assessment, to the

principal assumption underlying the assessment, to application of the assessment, and to the

conclusion of the assessment, the Forest Service relied upon the Payette RADT Committee to

conduct the Shoshone RADT Committee's risk assessment and prepare the Shoshone RADT

Report. The Forest Service then used the findings and conclusions of the Shoshone RADT

Report as the basis for banning domestic sheep and goats (including packgoats) on the Shoshone

NF. This is precisely the action prohibited by the Court's Orders. *See Idaho Wool Growers*

*Ass'n*, 2009 WL 3806371, at *4 ("[t]he Forest Service may not rely upon the Committees'

findings and/or conclusions in reaching future agency decisions"); *Idaho Wool Growers Ass'n*,

637 F. Supp. 2d at 880 (same).

**II.    Sanctions are Appropriate to Compensate the Wool Growers and Goatpackers and to Coerce the Forest Service to Obey the Court's Orders.**

      The Forest Service has not taken all reasonable steps to ensure compliance with the

Court's Orders on the Shoshone NF. *See Kelly*, 979 F. Supp. 2d at 1108 ("Failure to comply

consists of not taking all the reasonable steps within [one's] power to insure compliance with the

order.") (citation omitted). Actually, the Forest Service has not taken any steps to ensure

compliance. Although the Court need not find that the Forest Service's failure to comply with

the Court's Orders was willful in order to find the Forest Service in civil contempt, the Forest

Service's violation of the Court's Orders here was willful. *Id.* Such intent should factor into the

Court's imposition of sanctions. Ordinarily, the amount of a compensatory fine is the actual

damage caused to plaintiff by defendant's contumacious act, however, the amount of a

compensatory contempt fine is in the discretion of the court.  *U.S. v. Asay*, 614 F.2d 655, 660

(9th Cir. 1980) (citation omitted); *see also Kelly*, 979 F. Supp. 2d at 1108 (citation omitted).

Both before and after the Forest Service's formation of the Shoshone RADT Committee,

the Forest Service was aware of the Court's Orders prohibiting its reliance on the findings and

conclusions of the Payette RADT and Payette Principles Committees.  First and foremost, the

Secretary of the Department of Agriculture, the Chief of the Forest Service and the Forest

Service were all defendants in the 2008-2009 litigation that culminated in the Court's Orders.

Second, well before its formation of the Shoshone RADT Committee, the Forest Service on the

Shoshone NF was familiar with the Payette NF's replacement of the Payette RADT Report with

its 2010 quantitative risk assessment.  In fact, the Forest Service cites to the Payette NF's 2010

quantitative risk assessment in the Shoshone RADT Report.  Shoshone RADT Report at 2, 7, 20.

Finally, after its formation of the Shoshone RADT Committee, the Forest Service was

aware of its violation of the Court's Orders because the Goatpackers notified the Forest Service

in writing of such violation on numerous occasions.  The Goatpackers first notified the Forest

Service of its violation of the Court's Orders on October 10, 2012.[14]  The Goatpackers again

notified the Forest Service of its violation of the Court's Orders on March 20, 2014.[15]  The

Goatpackers sent copies of the Court's Orders to the Forest Service, detailed the Forest Service's

violation of the Orders and requested that the Forest Service prepare the Shoshone NF's risk

assessment without reliance on the findings and conclusions of the Payette RADT and Payette

Principles Committees.  *See* Goatpackers Comments at 13-14; Goatpackers Objections at 6-13.

---

[14] *See* Goatpackers, "Comments on the July 2012 Draft Environmental Impact Statement and Draft Land Management Plan for the Shoshone National Forest Land Management Plan Revision" ("Goatpackers Comments," attached in pertinent part as Ex. 18), at 13-14, Oct. 12, 2012.

[15] *See* Goatpackers, "Objections to the Shoshone Land Management Plan Draft Decision" ("Goatpackers Objections," attached in pertinent part as Ex. 19), at 6-13, Mar. 20, 2014.

The Goatpackers even met with the Forest Service on October 8, 2014 to discuss the Forest Service's violation of the Court's Orders. *See* Transcript of Proceedings:  Shoshone National Forest Objector Meeting ("Shoshone Objector Meeting," attached in pertinent part as Ex. 20), at 26, Oct. 8, 2014.  At that meeting, the Forest Service acknowledged the Court's Orders, but refused to discuss its violation of the Orders. *See id.* at 21 ("On the procedural side, we're not going to go over those today, you know, whether it addressed, you know, the Federal Advisory Committee Act or some specifics of the planning rule." (quoting Reviewing Officer, Associate Deputy Chief Jane Cottrell)); id. at 27, 29 (similar).  In response to the Goatpackers' Comments, Objections and face-to-face meeting with the Forest Service, the Forest Service ignored the Goatpackers and failed to take any steps comply with the Court's Orders.

Instead of taking reasonable steps to comply with the Court's Orders, such as going back and preparing a risk assessment that did not rely on the Payette RADT and Payette Principles Reports, the Forest Service attempted to deceive the public about its reliance on the Reports.  For example, in response to an objection that it relied on the Payette RADT and Payette Principles Committees in violation of the Court's Orders, the Forest Service stated:  "Neither the [Shoshone NF] analysis nor the literature cited for the analysis mentioned the [Payette] RADT Committee or the Payette Principles Committee."  Shoshone Objection Response, Attach. 2, at 54; *see also* Shoshone ROD at 32 ("The analysis for disease transmission conducted for the Forest Plan DEIS and FEIS is in no way connected to the [Payette] RADT Committee or the Payette Principles Committee.").  The Forest Service also added "[a] review of the project record finds no evidence to support the objector's conclusion."  Shoshone Objection Response, Attach. 2, at 55.

These statements by the Forest Service are false.  The Shoshone RADT Report not only mentions, but also cites directly to and relies upon the Payette RADT and Payette Principles

Reports.  *See, e.g.*, Shoshone RADT Report at 3, 4, 12, 19-20 (citing to the Payette RADT and

Payette Principles Reports).  Moreover, the "literature cited for the analysis" directly cites to the

Payette RADT and Payette Principles Reports.  *Id.* at 19-20.  Thus, even the most cursory

"review of the project record" "finds [ ] evidence to support the objector's conclusion" that the

Forest Service relied upon the findings and conclusions of the Payette RADT and Payette

Principles Committees in preparing the Shoshone RADT Report.

      Considering the Forest Service's complete disregard of the Court's Orders, and its

attempts to mask its violation of those Orders, both compensatory and coercive sanctions are

appropriate.  *See Gen. Signal Corp.*, 787 F.2d at 1379 (both compensatory and coercive

sanctions may be imposed for civil contempt).  Compensatory sanctions are appropriate to

compensate the Wool Growers and Goatpackers for the costs and attorneys' fees associated with

bringing this action.  *See In re Dyer*, 322 F.3d at 1195 ("[A]ttorneys' fees are an appropriate

component of a civil contempt award.") (citation omitted).  Compensatory sanctions are also

appropriate here to compensate the Goatpackers for the costs and attorneys' fees associated with

preparing its Comments and Objections, and meeting with the Forest Service, in an effort to

compel the Forest Service to comply with the Court's Orders.  *See Harcourt Brace*, 26 F.3d at

953 (costs and attorney's fees are properly awarded to make a party whole); *see also Asay*, 614

F.2d at 660 ("actual damage" caused by the contumacious act and should be compensated)

(citation omitted).

      Coercive sanctions are also appropriate to ensure that the Forest Service does not

continue to rely on the Payette RADT or Payette Principles Reports, or the Shoshone RADT

Report.  *See Gen. Signal Corp.*, 787 F.2d at 1379 ("[s]anctions for civil contempt may be

imposed to coerce obedience to a court order").  Other courts in similar situations have

considered a variety of strict sanctions to coerce the Forest Service to act in compliance with a court order. For example, in the Federal District Court for the District of Montana, where the Forest Service engaged in a "strategy to feign compliance with the law while in reality disregarding it," and the "record provid[ed] clear and convincing evidence supporting the conclusion that the Forest Service did not engage in the processes the law and the Court's orders required," the court considered (1) incarcerating Forest Service officials until the Forest Service met its legal obligations and complied with the Court's Orders; and (2) placing Forest Service officials under house arrest until the Forest Service met its legal obligations and complied with the Court's Orders. *See Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.*, 530 F. Supp. 2d 1126, 1135-36 (D. Mont. 2008).

Similar to the situation in *Forest Service Employees for Environmental Ethics*, here the record provides clear and convincing evidence supporting the conclusion that the Forest Service did not engage in the processes the law and the Court's Orders required. The record also supports the conclusion that this course of conduct was deliberate, as the Forest Service, with full knowledge of its violation of the Court's Orders, attempted to deceive the public about its violation rather than comply with the Orders. *See id.* at 1127, 1135-36 (discussing significance of Forest Service's intention to circumvent court's orders). As a result, coercive sanctions may be appropriate against Forest Service officials responsible for violation of the Court's Orders.

<u>CONCLUSION</u>

The Wool Growers and Goatpackers have shown by clear and convincing evidence that the Forest Service has violated the Court's July 1, 2009 and November 9, 2009 Orders. Accordingly, and for the reasons discussed herein, the Wool Growers and Goatpackers respectfully request that the Court:

1.      Hold the Forest Service in contempt of the Court's Orders;

2.     Hold unlawful and set aside the Forest Service's Shoshone RADT Committee and its Report;

3.     Hold unlawful and set aside the Forest Service's Shoshone LMP, ROD and FEIS to the extent they rely on the Shoshone RADT Committee and its Report;

4.     Sanction the Forest Service to compensate the Wool Growers and Goatpackers for their costs and attorneys' fees incurred in bringing and maintaining this action;

5.     Sanction the Forest Service to compensate the Goatpackers for the costs and attorneys' fees incurred to prepare its comments and objections and to meet with the Forest Service to notify the agency of its violation of the Court's Orders;

6.     Sanction the Forest Service to coerce its obedience to the Court's Orders;

7.     Award the Wool Growers and Goatpackers their attorneys' fees and costs incurred in bringing and maintaining this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or other applicable authorities; and

8.     Grant the Wool Growers and Goatpackers such other and further relief as the Court may deem necessary and appropriate.

RESPECTFULLY submitted this 24 day of June, 2015.

By: _____

William G. Myers III
Holland & Hart, LLP
Attorneys for Plaintiff Idaho Wool Growers
Association

Andrew A. Irvine
Andrew A. Irvine, P.C.
Attorney for Movant-Plaintiff North American
Packgoat Association

Wool Growers' & Goatpackers' Memorandum in Support - 19

## CERTIFICATE OF SERVICE

I certify that on June **24**, 2015, I electronically filed the foregoing with the Clerk of the

U.S. District Court of Idaho using the CM/ECF system, which sent a Notice of Electronic Filing

to the following person on whom a copy was also hand-delivered:

> Wendy J. Olson
> U.S. Attorney's Office
> 800 Park Boulevard, Suite 600
> Boise, ID  83712-9903
> wendy.olson@usdoj.gov

I also certify that on June **24**, 2015, I served a true and correct copy of the above and

foregoing via Certified U.S. Mail, postage prepaid, upon the following:

> Loretta E. Lynch
> Attorney General of the United States
> U.S. Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, D.C.  20530-0001

By: _____
William G. Myers III
Holland & Hart, LLP

Attorneys for Plaintiff Idaho Wool Growers
Association