UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO WOOL GROWERS ASSOCIATION and NORTH AMERICAN PACKGOAT ASSOCIATION,<br><br>      Plaintiff,<br><br>      v.<br><br>THOMAS VILSACK, in his official capacity as Secretary of the United States Department of Agriculture, THOMAS TIDWELL, in his official capacity as Chief of the United States Forest Service, and UNITED STATES FOREST SERVICE,<br><br>      Defendants. | Case No. 1:08-cv-00394-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## I.
## INTRODUCTION

Pending before the Court is the North American Packgoat Association's (the "Goatpackers") Motion to Join as Non-Party Plaintiff (Dkt. 54). Also pending is the Idaho Wool Growers Association and the Goatpackers' Motion for Order Holding Defendants in Contempt of Court (Dkt. 57). For the reasons explained below, the Court will grant the Goatpackers' motion to join this action as a non-party plaintiff. The Court will also grant the contempt motion to the extent that it will find defendants in contempt

of this Court's orders and award attorney's fees.  At this time, however, the Court will

deny without prejudice the other forms of relief plaintiffs seek, including their request to

"hold unlawful and set aside" various documents related to the Shoshone National Forest,

which is located in Wyoming.

## II.
## BACKGROUND

In April 2012, the wildlife biologist for the Shoshone National Forest prepared a

report addressing the risk of domestic sheep and goats transmitting diseases to bighorn

sheep herds on the Shoshone National Forest in Wyoming.  This report, referred to by the

parties as the "2012 Shoshone RADT [Risk of Disease Transmission] Report," cites to

and quotes chunks of text from an earlier, 2006 report.[1]  *Compare 2012 Shoshone RADT*

*Report,* Dkt. 58-5 *with 2006 Payette RADT Report,* Dkt. 58-3.  The 2006 report addressed

the same general topic – the risk of disease transmission – but it dealt with domestic and

bighorn sheep on the Payette National Forest in Idaho.  A committee established by the

United States Forest Service prepared the 2006 Payette report (the "2006 Payette RADT

Report").

The 2006 Payette RADT Report, along with a later, related report – referred to by

_____

[1] The Shoshone National Forest updated the April 2012 report in 2013, but the 2013, updated
report was not referenced by the Forest Service in developing the Shoshone National Forest Land
Management Plan revision, nor was it provided to the public.  *See May 28, 2015 email from Olga Troxel,*
*Land Management Specialist, Shoshone NF, to Andrew Irvine,* Ex. 7 to *Motion*, Dkt. 58-7.  Regardless,
plaintiffs say that the 2012 and 2013 reports use the same language regarding the alleged violation of the
Court's 2009 orders.  For simplicity's sake, the Court will refer to and cite just one report here – the 2012
report.

the parties as the "Payette Principles Report" (*see Nov. 2, 2006 Summary of Science Panel Discussion,* Dkt. 58-4) – was the subject of litigation in this Court in 2009. The Idaho Wool Growers Association and Dr. Marie S. Bulgin sued the Forest Service, complaining that they had been barred from participating in the committees that prepared the Payette reports, which allegedly resulted in a lack of representation by anyone engaged in domestic sheep management or behavior.

The Idaho Wool Growers Association is an Idaho non-profit organization that promotes the production and consumption of lamb and wool. At the time plaintiffs sued, Dr. Bulgin was the president of the Wool Growers Association. Plaintiffs describe Dr. Bulgin as "a well-known and highly-regarded expert on disease transmission and risk of disease among bighorn sheep and domestic sheep." *Compl.*, Dkt. 1, ¶ 12.

In July 2009, the Court granted summary judgment in favor of the plaintiffs, holding that the committees that prepared the Payette reports were advisory committees, and therefore subject to the procedural mandates of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2, §§ 1-16, and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1614. *July 1, 2009 Order,* Dkt. 37, *reported at Idaho Wool Growers Ass'n v. Schafer*, 637 F. Supp. 2d 868, 880 (D. Idaho 2009). The Court ordered that "the Committees' findings and/or conclusions are not to be relied upon by the Forest Service with respect to any future agency decisions." *Id.* Later, the Court clarified that the Forest Service could not "grandfather" the Committees' findings and/or conclusions or otherwise "rely upon the Committees' findings and/or conclusions in reaching future agency decisions – either directly or indirectly." *Nov. 9, 2009 Order,* Dkt.

46, *reported at Idaho Wool Growers Ass'n v. Schafer*, 2009 WL 3806371, at *2 (D. Idaho 2009).  In a nutshell, then, to comply with this Court's July and November 2009 orders, the Forest Service could rely upon the underlying sources cited in the Payette reports, but could not rely upon conclusions or findings of the Payette reports themselves.

Plaintiffs now say that when the Shoshone National Forest prepared its report on the health of bighorn sheep in the Shoshone National Forest, it improperly relied on the findings and conclusions of the Payette reports.  *See, e.g., Plaintiff's Ex. 11, Nov. 22, 2014 Shoshone Nat'l Forest Objection Responses,* Dkt. 58-12, at 54.  Plaintiffs say the Forest Service then used the "tainted" Shoshone report to justify banning domestic sheep and goats, including pack goats, from the Shoshone National Forest.  *See Motion Mem.,* Dkt. 58, at 3.  The Forest Service denies any such conduct; it has said that the "[t]he analysis of disease transmission conducted for the [Shoshone] Forest Plan DEIS and FEIS is in no way connected to the [Payette] RADT Committee or the Payette Principles Committee." *See Appendix to May 2015 Record of Decision for the Shoshone National Forest Land Management Plan Revision,* Dkt. 63-24, at 32, ¶ F-5(b).  This contempt motion eventually followed.  Plaintiffs seek monetary sanctions and they also ask the Court to "hold unlawful and set aside" the 2012 Shoshone RADT Report and various related documents.

### III.
### THE RULE 71 MOTION

Before deciding whether the Shoshone RADT Report improperly relies upon the findings and conclusions of the Payette reports, the Court will resolve the Goatpackers'

motion to join this case as a non-party under Federal Rule of Civil Procedure 71.

Rule 71 provides that "[w]hen an order grants relief for a nonparty . . . the procedure for enforcing the order is the same as for a party."  As the Ninth Circuit has pointed out, "Rule 71 was designed to memorialize the common sense rule that courts can enforce their orders against both parties and non-parties." *Westlake N. Prop. Owners Ass'n v. City of Thousand Oaks*, 915 F.2d 1301, 1304 (9th Cir. 1990).

Here, defendants do not challenge the Goatpackers' assertions that the Goatpackers were affected by this Court's 2009 orders.  Defendants therefore do not object to the Goatpackers joining this action as a non-party plaintiff under Rule 71.  *See Response Br.*, Dkt. 62, at 1.  The defendants do, however, object to the specific, substantive relief the Goatpackers seek, including the requests that the Court (1) hold defendants in contempt, and (2) award attorneys' fees to the Goatpackers.  *See id.* at 1-2. The parties briefed these issues within the contempt motion.  The Court will therefore grant the Goatpackers' motion to join this action as a non-party plaintiff under Rule 71 and will resolve the more specific relief sought by the Goatpackers in ruling on the contempt motion.

## IV.
## THE CONTEMPT MOTION

### A.    The Legal Standard

"The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court."  *Renwick v. Bennett (In re Bennett)*,

298 F.3d 1059, 1069 (9th Cir. 2002).  The contempt "need not be willful," and there is no good faith exception to the requirement of obedience to a court order.  *Go-Video, Inc. v. The Motion Picture Ass'n of Am. (In re Dual-Deck Video Cassette Recorder Antitrust Litig.)*, 10 F.3d 693, 695 (9th Cir. 1993); *see also Gen. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1379 (9th Cir. 1986).  Further, "courts in civil contempt proceedings may proceed in a 'more summary fashion' than in an 'independent civil action.'"  *Ahearn v. Int'l Longshore & Warehouse Union,* 721 F.3d 1122, 1130 (9th Cir. 2013) (quotation omitted).

Courts have "broad equitable power to order appropriate relief in civil contempt proceedings."  *SEC v. Hickey,* 322 F.3d 1123, 1128 (9th Cir. 2003) (citation omitted)).  "Sanctions for civil contempt may be imposed to coerce obedience to a court order, or to compensate the party pursuing the contempt action for injuries resulting from the contemptuous behavior, or both."  *Gen. Signal Corp.,* 787 F.2d at 1379 (citations omitted).  "[A]ttorneys' fees are an appropriate component of a civil contempt award."  *In re Dyer,* 322 F.3d 1178, 1195 (9th Cir. 2003) (citation omitted); *Harcourt Brace v. Multistate Legal Studies, Inc.,* 26 F.3d 948, 953 (9th Cir. 1994) ("An award of attorney's fees for civil contempt is within the discretion of the district court." (citation omitted)).

## B.    Discussion

The 2012 Shoshone RADT Report cites to both Payette reports, and copies various sentences verbatim, or mostly verbatim, from the 2006 Payette RADT Report.  The Forest defends this copying with two main arguments.  First, the Forest says the copying is permissible because the Court's 2009 orders prohibited it only from relying on the

"findings and/or conclusions" of the Payette reports.  *See July 1, 2009 Order,* Dkt. 37, at

23 ("the Committees' findings and/or conclusions are not to be relied upon by the Forest

Service with respect to any future agency decisions").  The Forest says that the 2012

Shoshone RADT Report cites only those parts of the Payette reports that do not contain

findings or conclusions.  Next, the Forest Service contends that any copying is

inconsequential because there is a raft of scientific literature supporting the conclusions

reached in the Shoshone RADT Report in any event.

     As will be discussed, the Court is not persuaded by either argument.  But to fully

understand the parties' arguments, and this Court's decision, it is necessary to back up

and take a closer look at the content and structure of the 2006 Payette RADT Report.[2]

### 1.  The 2006 Payette RADT Report

     The 2006 Payette RADT Report is 19 pages long.  It begins with a section entitled

*Background* and ends with a section entitled *Conclusions.*  In the *Background* section, the

author explains why the report is being generated – namely, because the Chief of the

Forest instructed the Payette Forest to analyze the effects of disease transmission from

domestic sheep to bighorn sheep on the Payette Forest.  The *Background* section then

provides this overview of the three-part analysis the Payette committee conducted:

    1) a review of the scientific literature on disease transmission from
       domestic sheep to bighorn sheep and the impacts that disease has on
       bighorn sheep populations;

---

[2] The Court does not fully detail the Payette Principles Report as plaintiffs allege only one
instance of copying from that report.  That issue is addressed below.

2) an evaluation of population data available for bighorn populations located within and adjacent to the Payette's boundaries; and

3) an expert panel assessment of risk of disease transmission from each of the Payette's domestic sheep allotments to nearby bighorn sheep populations.

*2012 Shoshone RADT Report,* Dkt. 58-3, at 1. The next few sections of the Payette report more or less follow this three-part analytical roadmap.

First up, there is a three and one-half page section entitled *Literature Review. See id.* at 2-5. This is a significant part of the report; the Forest Service has stated that a literature review "lies at the heart of any risk assessment." *Opp.*, Dkt. 63, at 15. It is not surprising, then, that the Payette committee drew various conclusions about the literature under review. Among other things, the committee reported that the "scientific literature" "indicates the following":

1. numerous examples of bighorn die-offs due to disease have been documented;

2. bighorn die-offs were documented as early as the mid 1800s and have been documented in every state in the western U.S.;

3. bighorn die-offs typically follow known or suspected contact with domestic sheep;

4. under experimental conditions, clinically healthy bighorn sheep have developed pneumonia and died within days to weeks following contact with clinically healthy domestic sheep;

5. a variety of diseases and pathogens have been implicated in die-offs, but most commonly the disease implicated in the die-off is bacterial pneumonia (Pasteurellosis) caused by *Mannheimia haemolytica* (formerly *Pasteurella haemolytica*) or other species of closely related Pasteurella bacteria; [and]

6.  there is consensus among wildlife biologists and veterinarians experienced in bighorn sheep management that domestic sheep and bighorn sheep must be kept separated in order to maintain healthy bighorn populations.

*2006 Payette RADT Report,* Dkt. 58-3, at 3 (citations omitted; paragraph divisions added).

After the *Literature Review* section, the 2006 Payette RADT Report contains sections discussing "*Domestic Sheep Grazing on the Payette NF*" and the "*Population Status of Bighorn Sheep Populations on the Payette NF.*"  Dkt. 58-3, at 5, 6.  Following these sections, there is a report of an *Expert Panel Risk Assessment.  See id.* at 10-14.

In this *Risk Assessment* section, the report explains that the committee convened a panel of "6 wildlife biologists, each with considerable knowledge of bighorn sheep biology and management, . . . ."  *Id.* The committee instructed the panelists to adopt this principal assumption in assessing the risk of disease transmission:  "Direct contact between domestic sheep and bighorn sheep results in a high likelihood of disease transmission to bighorn sheep and disease outbreak in local bighorn herd."  *Id.* at 11.

With this assumption in place, the panelists were tasked with going though through each sheep allotment on the Payette National Forest, one by one, and opining how likely it would be that domestic sheep would transmit disease to bighorn sheep on that particular allotment.  *See id*. at 10-12 (providing further detail on the risk analysis methodology).  Depending on the allotment, their conclusions varied from a "very low risk of disease transmission" to a "very high risk of disease transmission."  *Id.* at 10.

After finishing the three-part analysis just discussed (literature review; evaluation

of bighorn sheep populations; expert panel risk assessment), the 2006 Payette RADT

Report contains a three and one-half page *Discussion* section, followed by a *Conclusions*

section.  *Id.* at 15, 18.

### 2. The 2012 Shoshone RADT Report

The 2012 Shoshone RADT Report is similar in many respects to the 2006 Payette

RADT Report.  In fact, when the two reports are viewed alongside each other, it becomes

apparent that the author of the Shoshone report used the 2006 Payette RADT Report as a

template, liberally copying text from the Payette report into his report.

### a. The *Background* Section

The copying first appears in the *Background* section of the Shoshone report, which

uses the same verbiage as the *Background* section of the Payette 2006 RADT Report to

explain why the report is being generated and, more substantively, what type of analysis

is being performed.  Specifically, plaintiffs compare the following sentences from the

2012 Shoshone RADT Report and the 2006 Payette RADT Report:

| 2006 Payette RADT Report | 2012 Shoshone RADT Report |
|---|---|
| *Background* | *Background* |
| "Following direction from the Chief's Reviewing Officer, the Payette NF conducted an analysis of the effects of disease transmission from domestic sheep grazed on the forest to bighorn sheep populations occurring within and near the Payette NF."  *2006 Payette RADT Report,* at 1. | "Following direction from the Deputy Chief, the Shoshone staff conducted an analysis of the effects of disease transmission from domestic sheep and goats on the Forest to bighorn sheep populations occurring within and near the Shoshone."  *2012 Shoshone RADT Report,* at 1. |
| "The analysis was conducted at the spatial scale of the Payette NF . . . . The analysis | "The analysis was conducted at the spatial scale of the Shoshone and consists of four |

| | |
|---|---|
| consists of 3 parts: 1) a review of the scientific literature on disease transmission from domestic sheep to bighorn sheep and the impacts that disease has on bighorn sheep populations; 2) an evaluation of population data available for bighorn populations located within and adjacent to the Payette's boundaries; and 3) an expert panel assessment of risk of disease transmission from each of the Payette's domestic sheep allotments to nearby bighorn sheep populations." <br><br> *2006 Payette RADT Report,* at 1. | parts: (1) a review of the scientific literature on disease transmission from domestic sheep and goats to bighorn sheep and the impacts that disease has on bighorn sheep populations; (2) an evaluation of domestic sheep and goat use on the Shoshone; (3) an evaluation of population data available for bighorn populations located within and adjacent to the Shoshone's boundaries; and (4) and an assessment of risk of disease for each of the Shoshone's bighorn sheep herds from domestic sheep and goat use on the Forest." *2012 Shoshone RADT Report,* at 1. |

Plainly, the Shoshone report copied portions of text from the Payette report. Preliminarily, the Court observes that using the 2006 Payette RADT Report as a template was arguably a bad judgment call in light of this Court's 2009 orders. But, still, the copying shown above does not create any substantive problems. Most significantly, in this section, the Shoshone Forest did not rely upon or cite to any findings or conclusions from the Payette report.

Plaintiffs' argument is broader than that, however. They say that the copying in the *Background* section demonstrates that the Shoshone National Forest improperly undertook the same type of analysis – using more or less the same steps – as did the Payette committee in 2006. But nothing in this Court's 2009 orders prohibited the Shoshone Forest from undertaking such an analysis. More specifically, this Court's order did not prohibit the Forest Service from analyzing the risk of disease transmission from domestic sheep or goats by (1) reviewing scientific literature; (2) evaluating bighorn sheep population data; and (3) convening an expert panel to assess the risk that domestic

sheep or goats will transmit diseases to bighorn sheep.  Rather, in reaching its 2009 decisions, the Court clarified that the scientific information underlying the Payette reports could be used in the future:  "If, indeed, the [Payette] Committee represented only a mechanism to collect and summarize all available data relevant to the issue at hand, that same, underlying information would exist to support future agency decisions as well." *July 1, 2009 Order,* Dkt. 37, at 23; *see also Nov. 9, 2009 Order,* Dkt. 46, at 7.

Nevertheless, if the Shoshone Forest decided to conduct the multi-step analysis described above, it would have to conduct each step independently in light of this Court's 2009 orders.  It could not simply cut and paste findings or conclusions from the Payette reports into its report.  The Shoshone Forest did not walk that particular line.

### b.     The *Literature Review* Section

Problems first crop up in the *Literature Review* section of the 2012 Shoshone RADT report.  In that section, the author begins by reporting that in 2006, the Payette committee had compiled "[o]ne of the most current literature reviews of disease transmission between domestic animals and bighorn sheep . . . ."  *Shoshone 2012 Report,* Dkt. 58-5, at 2.  The Shoshone report then says that "pertinent information" from the Payette committee's literature review "was extracted from the Payette's risk assessment [*i.e.*, from the Payette 2006 RADT Report] and brought forward into this risk assessment."  *Id.*  Then, in the next paragraph, the Forest Service copied a large, substantive paragraph and pasted it practically word for word into the 2012 Shoshone RADT Report, although it added the phrase "and goats" or "or goats" to a couple of

sentences.  For ease of reference, the paragraphs from both reports are shown side by side

in this chart:

| 2006 Payette RADT Report | 2012 Shoshone RADT Report |
|---|---|
| **Literature Review**<br><br>Effects of Disease on Bighorn Populations<br><br>"An extensive body of scientific literature on the effects of disease on bighorn populations has accumulated. The literature indicates the following: 1) numerous examples of bighorn die-offs due to disease have been documented; 2) bighorn die-offs were documented as early as the mid 1800s and have been documented in every state in the western U.S.; 3) bighorn die-offs typically follow known or suspected contact with domestic sheep; 4) under experimental conditions, clinically healthy bighorn sheep have developed pneumonia and died within days to weeks following contact with clinically healthy domestic sheep; 5) a variety of diseases and pathogens have been implicated in die-offs, but most commonly the disease implicated in the die-off is bacterial pneumonia (Pasteurellosis) caused by Mannheimia haemolytica (formerly Pasteurella haemolytica) or other species of closely related Pasteurella bacteria; 6) there is consensus among wildlife biologists and veterinarians experienced in bighorn sheep management that domestic sheep and bighorn sheep must be kept separated in order to maintain healthy bighorn populations." *2006 Payette RADT Report,* at 3. | **Literature Review**<br><br>Effects of Disease on Bighorn Populations<br><br>"An extensive body of scientific literature on the effects of disease on bighorn populations has accumulated. The literature indicates the following: (1) numerous examples of bighorn die-offs due to disease have been documented; (2) bighorn die-offs were documented as early as the mid 1800s and have been documented in every state in the western U.S.; (3) bighorn die-offs typically follow known or suspected contact with domestic sheep *or goats*; (4) under experimental conditions, clinically healthy bighorn sheep have developed pneumonia and died within days to weeks following contact with clinically healthy domestic sheep; (5) a variety of diseases and pathogens have been implicated in die-offs, but most commonly the disease implicated in the die-off is bacterial pneumonia (Pasteurellosis) caused by *Mannheimia haemolytica* (formerly *Pasteurella haemolytica*) or other species of closely related *Pasteurella* bacteria; and (6) there is consensus among wildlife biologists and veterinarians experienced in bighorn sheep management that domestic sheep ***and goats*** and bighorn sheep must be kept separated in order to maintain healthy bighorn populations." *Shoshone RADT Report,* at 2 (emphasis added). |

As plaintiffs have pointed out, the author of the Shoshone report does not cite any new sources to support the conclusions drawn in that lengthy, six-part sentence quoted above.  Instead, he relied on the same sources – minus quite a few – that were cited in the Payette report.  *Compare 2012 Shoshone RADT Report,* at 2 *with 2006 Payette RADT Report,* at 3.[3]

The Forest Service defends this copying in three ways.  First, it says the part of the Payette report it copied does not contain any "findings" or "conclusions."  Rather, the Forest says that the authors of both reports were simply "summariz[ing] the scientific literature in the same way." *Opp.*, Dkt. 63, at 15.  Second, and more broadly, the Forest Service says the copying does present any substantive issues because there is an "enormous body" of literature supporting the statements made.  Finally, and relatedly, the Forest Service points out that the 2012 Shoshone RADT Report cites numerous authorities post-dating the 2006 Payette reports.

None of these arguments is persuasive.

---

[3] This relined paragraph shown here compares the stringcite contained in both reports.

> e.g., ~~Foreyt and Jessup 1982; Goodson 1982;~~ ~~Onderka and Wishart 1988;~~ Foreyt 1989; ~~Desert Bighorn Council Technical Staff 1990; Callan et al. 1991; Cassiser et al. 1996;~~ Martin et al. 1996; ~~USDI Bureau of Land Management 1988; Bunch et al. 1999;~~ Singer et al. 2000a, 2000b, 2000c, 2000d; Monello et al. 2001; Schommer and Woolever 2001; Singer et al. 2001; ~~Dubay et al. 2002;~~ Garde et al. 2005.

The 2006 Payette RADT Report cited all sources shown, including those in strike-through text. The 2012 Shoshone Report cites only those sources shown in regular text.

First, the Payette committee drew conclusions about the literature it reviewed.  If there was any real question on this point, it would be resolved after reading the "*Conclusions*" section of the Payette report.  Not only is that section plainly labeled *Conclusions,* but in the opening paragraphs, the Payette committee discussed the scientific literature.  The first few lines of the *Conclusions* section states:

> *Conclusions*
>
> Although important aspects of bighorn sheep disease ecology are still poorly understood, *the scientific literature indicates* that: 1) when in close contact, domestic sheep commonly transmit diseases to bighorn sheep; 2) some of these diseases (e.g., Pasteurellosis or pneumonia) result in mortality of large portions of bighorn sheep herds and cause depressed recruitment for years, and thus have significant impacts on bighorn sheep populations dynamics; and 3) bighorn sheep and domestic sheep must be kept separated if one of the management goals is to maintain viable populations of bighorn sheep.

*2006 Payette RADT Report*, Dkt. 58-3, at 18 (emphasis added).

The author of the 2012 Shoshone Report perhaps missed this point; he says he did not "focus on *or review*" various parts of the Payette RADT Report that include the *Conclusions* section.  *Harper Dec.* ¶ 24 ("I did not focus on or review the pages following the heading *Results* on page 12 of the Payette RADT Report."[4]).

But even assuming the *Conclusions* section did not exist, a common-sense reading of the *Literature Review* section shows that the Payette committee was drawing conclusions about the literature.  This is particularly true in the larger context.  As already

---

[4] The *Conclusions* section begins on pages 18 of the 2006 Payette RADT Report.  Dkt. 58-3.

noted, the Forest Service has pointed out that a literature review is a key part of a risk assessment such as this.  *See Response Br.*, Dkt. 63, at 15 (a literature review "lies at the heart of any risk assessment").

Further, it is important to remember that plaintiffs complain that the Payette committee was biased from the outset and, as such, drew incorrect or biased conclusions from the literature under review.  As just one example, the Goatpackers say that the Payette committee cited a source – "Rudolph et al. 2003" – for the proposition that "domestic goats . . . can transmit *M. haemolytica* to bighorn sheep" when the underlying source provided no support for that statement.  *See Goatpackers' Rule 71 Motion Mem.*, Dkt. 55, at 14 & 14 n.7.  Under these circumstances, the Court is not persuaded by the defendants' argument that the *Literature Review* section of the 2006 Payette RADT Report does not contain any findings or conclusions.

Defendants also argue that any copying here (or elsewhere in the 2012 Shoshone RADT Report) is inconsequential because the Shoshone National Forest "relied on an enormous body of scientific literature (much of which post-dated the Payette committees' reports), along with its own independent analysis."  *Opp.*, Dkt. 63, at 1.  But in reaching conclusions about various articles (as shown in the above chart) the Forest Service did not cite a single new source.  Instead, as already discussed, the Shoshone Report copied the 2006 Payette report almost verbatim and then cited the same sources (minus several) as support.  *See footnote* 3, *supra*.  No new or later authorities were relied upon for these conclusions.

Granted, the Forest Service did cite other, later authorities elsewhere in the 2012

Shoshone RADT Report.  Additionally, in 2015, the Shoshone Forest reviewed nine

additional sources regarding disease transmission from domestic sheep and goats to wild

sheep.  *See 2015 Amendment to the 2013 Biological Evaluation for the Revised Shoshone*

*National Forest Land Management Plan*, Dkt. 58-13, at 16-17; *Wilder Dec.*, Dkt. 63-20,

¶¶ 13-14.  But this does not change the fact that the Forest Service nevertheless relied on,

and cited to, the Payette reports.

To a much lesser extent, the author of the Shoshone Report relied on a conclusion

reached in the 2006 Payette Principles Report.  Specifically, the Shoshone Report says

the following:  "Not all pasteurellosis epidemics in bighorn sheep can be attributed to

contact with domestic sheep (USDA FS 2006b)."  *See 2012 Shoshone Report,* at 4.  (The

reference to "USDA FS 2006b" is the shorthand citation to the Payette Principles Report.

*See 2012 Shoshone Report,* at 20.)

The Forest defends this copying with arguments similar to those already discussed.

First, the Forest says there is other, independent support for this conclusion so the citation

to the Payette Principles report should not matter.  *See Opp.* Dkt. 63, at 10 ("the 2012

Shoshone RADT Report had an independent basis to conclude that not all pasteurellosis

can be attributed to contact with domestic sheep").  The Court is not persuaded for the

reasons already discussed.  If this statement could be supported with other authorities, the

Forest should have done that.

Next, the Forest Service says the Payette Principles Summary "does not identify

'findings' or 'conclusions,'" which made it difficult for the Forest to know whether it

could freely copy any given statement.  *See Opp.*, Dkt. 63, at 10 n.2.  Again, the Court is

not persuaded.  The main point of the Court's 2009 orders was to instruct the Forest Service to look elsewhere – not to the Payette reports themselves – to support future agency decisions.  Under those circumstances, the Forest Service should have known that it would need to look to other articles to support conclusory statements such as the one shown above.

Finally, the Forest Service says that even if the statement quoted above is, indeed, a finding or conclusion, the Shoshone Forest did nothing more than commit a "technical violation" of this Court's orders.  If this citation were the *only* stumble related to the 2006 Payette reports, this argument might have some persuasive force.  But this was not the only stumble; it is one of many.  Under those circumstances, the Court concludes that the Forest Service did not make a reasonable attempt to comply with this Court's orders.

      **c.**     **The *Assessment of Risk* Section**

Moving into the *Assessment of the Risk* section of the 2012 Shoshone RADT Report, plaintiffs identify three instances of copying, which the Court will discuss in turn.

***The Lehmkul Methodology.***  Plaintiffs first complain that the Shoshone Forest copied the same methodology the Payette committee's expert panel employed.  More specifically, both the Payette committee and the Shoshone National Forest convened an expert panel to assess risk of disease transmission by using a "structured outcome scale."  The 2006 Payette RADT Report indicates that the source of this outcome scale is "Lehmkul et al. 1997," and the Forest reports that "both the 2012 Shoshone Report and the Payette Report used the Lehmkul methodology in preparing the qualitative analysis." *Opp.*, Dkt. 63, at 12.

The 2012 Shoshone RADT Report, however, does not cite or discuss "Lehmkul." Instead, it cites only to the 2006 Payette RADT Report, as shown here:

> Because of the lack of quantitative models available to predict likelihood of disease outbreak in bighorn sheep populations due to potential contact with domestic sheep or goats (including packgoats), the same basic outcomes, with the addition of domestic packgoats, identified by the Payette National Forest (USDA Forest Service 2006a) and used in the Payette's risk assessment, are utilized in this risk assessment.

*Shoshone 2012 RADT Report,* Dkt. 58-5, at 12.

It would be permissible for the Shoshone Forest to independently decide which particular methodology is appropriate, including, theoretically, the "Lehmkul methodology." The problem, however, is that the Shoshone Forest justified its chosen methodology by citing only to the Payette RADT Report. This should be an easy fix; the author would simply need to independently conclude that Lehmkul provides the appropriate "structured outcome scale." The fact remains, however, that this was not done, and the author's decision to rely upon the 2006 Payette RADT Committee report to support this decision violates this Court's 2009 orders.

***The Principal Assumption.*** Another problem in the Shoshone Report's *Assessment of the Risk* section is the "principal assumption" the expert panel adopted in performing the qualitative risk assessment. The Shoshone National Forest instructed its panel members to adopt the following "principal assumption for rating disease transmission risk":

> Direct contact between domestic sheep *or goats (including pack goats)* and bighorn sheep results in a high likelihood of disease transmission to bighorn sheep and disease outbreak in local bighorn sheep herds.

*Shoshone 2012 RADT Report,* Dkt. 58-5, at 13.  Plaintiffs complain that the Shoshone

Forest copied this principal assumption verbatim from the 2006 Payette RADT Report,

modifying it only to include goats, as shown in the italicized text above.  *Compare 2006*

*Payette RADT Report,* Dkt. 58-3 at 11 (stating the principal assumption as follows:

"Direct contact between domestic sheep and bighorn sheep results in a high likelihood of

disease transmission to bighorn sheep and disease outbreak in local bighorn herd.").

        The Forest says there is no problem with using this "principal assumption"

because, according to the Forest, this Court sanctioned the ongoing use of such an

assumption in another, related litigation.  *See Response Br.*, Dkt. 63, at 12-13 (citing

*Idaho Wool Growers Association v. Vilsack*, 7 F. Supp. 3d 1085 (D. Idaho 2014)

(Tashima, J.)).

        In that earlier litigation, *Idaho Wool Growers Association v. Vilsack*, 7 F. Supp. 3d

1085 (D. Idaho 2014), this Court resolved the Wool Growers' challenge to the adequacy

of the Forest Service's July 2010 Final Supplemental Environmental Impact Statement

(FSEIS) and the Record of Decision (ROD) related to three national forests in Idaho,

including the Payette National Forest.  Among other things, the Wool Growers

complained that the Forest Service had improperly relied on the 2006 Payette RADT

Report to support the same principal assumption stated above.  The Court rejected this

argument, explaining that the Forest had not relied on the Payette Report, but had instead

"relied primarily on their extensive review of disease transmission research and literature

to substantiate the link."  *Id.* at 1100.

        Significantly, however, the Court did not say that Forest Service was now free to

use this "principal assumption" to support future agency decisions – without any further independent analysis.  Rather, in future cases, the same analysis must be performed, meaning that the Court must continually look to the document at issue to see if the Forest Service supported its conclusions independently, rather than by relying on findings and conclusions of the Payette RADT Report.

In this case, then, the logical place to support the stated principal assumption would be in the *Literature Review* section of the report.  That section, however, is infected by the author's reliance on the 2006 Payette RADT Report, as discussed above.

***Foray Distances.***  Finally, plaintiffs complain that the Shoshone Forest improperly cited the 2006 Payette RADT Report to support estimated "foray distances" for bighorn rams on the Shoshone National Forest.  (In this context, a "foray" refers to bighorn rams traveling outside their "core home range . . . ."  *See 2012 Shoshone RADT Report,* Dkt. 58-5, at 13.)  The disputed part of the Shoshone report reads as follows:

> Although the foray distance for bighorn rams on the Shoshone is not known, the data compiled by the Payette National Forest (USFS 2006a) could be used to represent the potential foray distance on the Shoshone. They found that most sheep forayed from 0-26 km outside of their core home range with the longest foray being 35 km.

*Id.* at 13 (citing the 2006 Payette RADT Report as "USFS 2006a").

As plaintiffs point out, the author of the Shoshone report did not cite to any underlying data compiled by the Payette committee, nor did he provide any independent basis for his statements relating to foray distance.  So, on the surface, this would appear to be another violation of this Court's 2009 orders. The problem, however, is that neither Payette report even discusses foray distances – much less makes any findings or reaches

conclusions about foray distances.  As such, the Court is persuaded that the author of the

Shoshone report mistakenly cited the 2006 RADT Report for this point.  *See Harper*

*Dec.,* Dkt. 63-1, at 7 n.2 ("There was an error in the SNF RADT Report, which

incorrectly cited the 2006 report for the foray distances used.  The citation should have

been to the Payette's 2010 decision for foray distances.  There are no estimates of

bighorn sheep foray distances contained in the Payette's 2006 reports.").

### 3.   Contempt Finding

The Forest Service argues that even if it violated this Court's orders, it should not

be held in contempt because its interpretation of the Court's orders was reasonable. The

Forest Service also says this Court's orders were not specific and definite enough to

justify a finding of contempt.

The Court is not persuaded.  For all the reasons explained above, the Forest

Service's narrow definition of what constituted "findings" and "conclusions" of the

Payette RADT Report is simply not persuasive.  At a minimum, the Forest should have

sought clarification from this Court regarding the meaning of a "finding" or "conclusion"

– particularly when (1) the Goatpackers were complaining that the Forest Service was

violating this Court's orders; and (2) the Forest Service had used the 2006 Payette RADT

as a template – liberally copying chunks of text from that report into the Shoshone

Report.  The Court therefore finds the defendants in contempt of this Court's July 1, 2009

and November 9, 2009 orders.

### 4.   Sanctions

Having found the defendants in contempt, the Court must next determine what

sanctions, if any, to impose.  Sanctions for civil contempt may be imposed to coerce obedience to a court order, or to compensate the party pursuing the contempt action for injuries resulting from the contemptuous behavior, or both.  G*en. Signal Corp. v. Donallco, Inc.*, 787 F.2d 1376, 1380 (9th Cir. 1986).

Plaintiffs seek a various forms of relief, which fall into two general categories – (1) monetary relief; and (2) orders "setting aside" and declaring as "unlawful," the 2012 Shoshone RADT Report and various related documents, including the Shoshone Land Management Plan, the Shoshone Record of Decision, and Shoshone Final Supplemental Environmental Statement.  *See Motion Memo.*, Dkt. 58, at 19.

The monetary relief sought is the easier question.  Plaintiffs request (1) an award of costs and attorneys' fees to both plaintiffs in connection with this action; (2) an award of costs and attorneys' fees to the Goatpackers in connection with pre-litigation activities; and (3) an award of coercive sanctions, payable to the Court.  *Id.*

Based on the evidence described above, the Court concludes that an attorneys' fee award is proper.  In short, the Forest should have complied with this Court's orders from the beginning, but it certainly should have reconsidered its position after the Goatpackers objected to the use of the Payette reports.  The plaintiffs should be compensated for the fees they had to incur.  At this point, Plaintiffs have not specified any particular amount, so the Court will decide that issue after plaintiffs have submitted their fee application and supporting billing records.

The Court concludes that a fee award will be sufficient in this matter; it will not order payment of coercive sanctions.

In addition to these monetary awards, plaintiffs ask the Court to "hold unlawful and set aside" the 2012 Shoshone RADT report.  Additionally, Plaintiffs say that that "the Forest Service used the tainted Shoshone RADT Report as the primary justification for banning sheep and goats (including packgoats) from the Shoshone NF through the Shoshone NF Revised Land and Resource Management Plan [LMP]."[5]  *Motion Mem.*, Dkt. 58, at 3.  Plaintiffs therefore ask the Court to hold unlawful" and set aside the LMP to the extent it relies on the Shoshone Report.  Likewise, the plaintiffs ask the Court to hold unlawful and set aside the Shoshone Record of Decision (ROD) and Final Environmental Impact Statement for the Shoshone LMP (the FEIS) to the extent these documents rely on the Shoshone Report.[6]  *Motion Mem.*, Dkt. 58, at 19.

The Forest says such relief is improper for two reasons.  First, the Forest says that "Plaintiffs have failed to show that the Shoshone LMP, ROD or FEIS, rely on any of the contested statements in the 2012 Shoshone RADT Report or that the statements in the 2012 Shoshone RADT Report were improper."  On this point, the Court disagrees.  For all the reasons explained above, the 2012 Shoshone RADT Report relied on the findings and conclusions of the Payette reports.  And, after reviewing the relevant portions of the LMP, the ROD, and the FEIS, the Court agrees that the actions taken there – mainly,

---

[5] Portions of the 2015 revised Shoshone Land Management Plan are attached as Exhibit 8 to plaintiffs' motion.  *See* Dkt. 58-8.

[6] The Shoshone Record of Decision for the Land Management Plan Revision is attached to plaintiff's motion as Exhibit 10.  *See* Dkt. 58-10.  Portions of the May 2015 Shoshone Final Environmental Impact Statement is attached to plaintiff's motion as Exhibit 11.  *See* Dkt. 58-11.

banning sheep and goats on the forest – relied at least in part on the 2012 Shoshone
RADT Report.

The Forest next says that if plaintiffs wish to "challenge the Shoshone LMP, ROD
or FEIS," they should do so "directly by bringing an action under the Administrative
Procedure Act in Wyoming with a full record." *Opp.*, Dkt. 63, at 20. Given this objection
– and given that the Shoshone National Forest is in a different state, district and circuit –
the Court will defer ruling on plaintiffs' request to hold unlawful and set aside various
documents.  Instead, the Court will set a status conference to discuss these issues with the
parties.

## ORDER

For the foregoing reasons, it is **ORDERED that**:

(1) The Goatpackers Motion to Join as Non-Party Plaintiff (Dkt.  54) is
GRANTED to the extent that the Court will allow them to join this action as a
plaintiff.  Any remaining relief requested in that motion is DEEMED MOOT
as the Court will resolve such requests in the context of resolving plaintiffs'
contempt motion.

(2) Plaintiffs' Motion for Contempt (Dkt. 57) IS GRANTED IN PART, DENIED
IN PART, and DENIED WITHOUT PREJUDICE IN PART as follows:

    a.  Plaintiffs' request to find defendants in contempt of this Court's July 1,
2009 and November 9, 2009 Orders IS GRANTED.

    b.  Plaintiffs' request for an attorney fee award is GRANTED. The Court
will determine the extent and scope of such fee award upon a motion

filed by plaintiffs.  Plaintiffs are directed to file such a motion within 30 days of this Order.

c.  Plaintiffs' request for coercive sanctions is DENIED.

d.  Plaintiffs' request to "hold unlawful and set aside" the Shoshone RADT Report and various related reports is DENIED WITHOUT PREJUDICE.

DATED: February 23, 2016

B. Lynn Winmill
Chief Judge
United States District Court